WELCH, Judge.
Brent Adam Dove was convicted of the murder .of Alma Dixon, in violation of § 13A-6-2, Ala.Code 1975. Dove was sentenced as an habitual felony offender to life imprisonment without the possibility of parole. This appeal follows.

Facts

On January-2, 2013, Mobile police officers responded to an emergency 911 telephone call regarding an incident at -Dove’s apartment. Upon entering the apartment, the officers found- Alma Dixon’s lifeless body. The officers noticed bruising near her mouth and cheek. Dove informed the officers that he had gone to sleep around 9:30 or 10:00 the night before and that he had called 911 that morning, after he was unable to wake Dixon and found that she was cold to the touch.
Kevin Pierce testified that he had sold crack cocaine to Dove and Dixon three or four times each day for several months before Dixon’s death. On December 31, 2012, Pierce went to Dove’s apartment to sell cocaine. He stated that Dove and Dixon were drinking but that - everything appeared to be normal. After Pierce left, *890 Dove , called and sent text messages to him, requesting' more- cocaine, but Pierce refused the Request because he knew Dove and Dixon had no. money to pay him. Pierce testified that, on January 2, 2013, he went to the apartment to cheek on Dove and Dixon because he had not heard from them since shortly after his last visit. Upon arriving at their apartment, he saw police officers standing outside with Dove. Pierce was unable to talk with Dove at that time, but they spoke later by telephone. Pierce testified that, during that telephone conversation, Dove said that he had been told that Dixon had died of an overdose but that, in fact, that was not the cause of her death.
An autopsy revealed that Dixon had suffered extensive bruising to several areas of her body, including her face. Hemorrhages were also found on her right hand, on the base of one thumb, over her wrist area, and on two fingers. Wounds to Dixon’s hands were classified as defensive wounds. The autopsy established that the cause of death was blunt-force trauma to the head. The death was ruled a homicide. Dixon’s blood tests indicated that, at the time of her death, she had cocaine in. her system but did not have alcohol or Klonopin, a drug for which Dixon had a prescription, in her system. A toxicologist for the Alabama Department of Forensic Sciences (“DFS”) testified that Dixon could not have died from an overdose because the drug levels in her body were not sufficient to cause death. Test results from Dove’s fingernail scrapings did not match Dixon’s' DNA. Tests of Dixon’s fingernail scrapings had not been completed at the time of trial.
Dove was arrested for Dixon’s murder on the day the autopsy was completed. He was held at the Mobile County jail. Dennie Bramlett, who had been in jail with Dixon, testified that Dove first told him that Dixon had died when she asphyxiated on her own vomit. Bramlett testified that Dove later told him that he had killed Dixon after becoming enraged when she told him she was leaving him. Bramlett testified that Dove had told him that he had struck Dixon on the head and then had tried to make it look as if she had died after having an accident while she was drunk. However, Eric James Davis, who had also been in jail at the same time, testified that Dove had told him and Bram-lett that he did not kill Dixon. -
Dove made four statements to the police, and he claimed in each statement that he had nothing to do with Dixon’s death. However, there were inconsistencies between some of his statements as to what time he fell asleep and whether Dixon had taken any drugs on the night she-died. Dove maintained in each statement that everything had been normal when he went to bed that night and that he did not know until the next morning that Dixon had died. ' ■

Analysis ■'

On appeal, Dove raises three issues, but because we reverse the trial court’s judgment on the basis that the trial court erroneously denied Dove’s motion for a continuance, we pretermit discussion of the other issues.
Dove filed a motion , for a continuance a week before trial, after he was informed by DFS" employees that the test results from the analysis of Dixon’s fingernail scrapings would not be available by the date trial was set to begin. The trial court denied the motion. During a pretrial hearing on another matter, the State raised the issue of Dove’s motion for a continuance. The State acknowledged that the results from tests of Dixon’s fingernail scrapings had not yet been received, but it nevertheless wanted to proceed to trial. The State claimed that the *891 test results were not material to Dove’s defense because, it said, Dove had never claimed that someone else was in the apartment at the time of Dixon’s death. The State further argued that, in his statements to the police, Dove had said that he was the only person present in the apartment when Dixon died and that Dove’s defense was that the death resulted from an overdose. Thus, the. State argued, only the State would be prejudiced by proceeding to trial without the test results. The trial court denied the motion for a continuance, in part, because Dove had consistently denied killing Dixon and, therefore, the results- of the analysis would be irrelevant.
Dove argued that autopsy results indicated that there were injuries to Dixon’s hands and that the photographs of Dixon’s hands, which he intended to use at trial, showed that a struggle -had taken place and that Dixon had been trying to defend herself by fighting back or holding someone off. He argued that the test results “could show that someone else was attacking her and not Mr. Dove. So that’s why it’s so highly exculpatory.” (R. 43.) He further argued to the trial court: “[Dove’s] nails have been analyzed and came back negative. And, therefore, it’s critical in this case where with all these injuries to her hands that we be able to see is there anyone else’s DNA under her fingernails. And we think that would be critical to the defense.” (R. 43.) The trial court then stated: “I don’t think that it’s improper for you to ask the doctor did you take any scrapings out from underneath her fingernails and did any of them show his DNA. He’s going to say I don’t know what it showed.” (R. 43.) Dove responded: “Judge, the reason it would be so critical, we would hope the test would show that it was not Mr. Dove but it was someone else and that’s why it’s critical.”' (R. 33-34.) The trial court and Dove continued to discuss the issue:
“THE COURT: Well, I think once you ask were there scrapings done, yes; were they submitted, yes; did any of it come back my client, no, it hasn’t.
“MR. HALE [defense counsel]: And I agree. But we were hoping to go a step further that, no, it didn’t come back to your client. It came back to say Mr.—
' “THE COURT:' What if it came back . to your client?
“MR'. HALE: Well,:that’s a risk that he wanted to take because he didn’t do it. .
“THE COURT: Well, I think you’re better off with my ruling.*’
(R. 44.) (Emphasis added.) The trial court then" reaffirmed its denial of Dove’s motion for a continuance.
When reviewing a'trial court’s ruling on motion for a continuance, the Alabama Supreme Court has stated:'
“A motion for a continuance is addressed to the discretion of the court and the court’s ruling on it will not be disturbed unless there is an abuse of . discretion, Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If: the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 96 So. 481, 485-86 (1923).”
Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986).
We examine Dove’s arguments in light of the factors set forth in Saranthus. First, the test results regarding Dixon’s *892 fingernail scrapings would have been material and competent. “Material evidence has been defined as ‘[e]vidence which has an effective influence or bearing on questions in issue.’ Black’s Law Dictionary 976 (6th ed.1990). ‘Simply put, a “material” fact is one that would matter in the trial on. the merits.’ Sumner v. Sumner, 664 So.2d 718, 723 (La.App.1995).” Smith v. State, 698 So.2d 189, 205 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997). “ ‘Competent evidence’ is evidence that is admissible and material and relevant to the fact sought to be proved. Hammann v. City of Omaha, 227 Neb. 285, 417 N.W.2d 323 (1987); see also Black’s Law Dictionary 284 (6th ed.1990).” R.G, v. Calhoun Cnty. Dept. of Human Res., 716 So.2d 219, 220 (Ala.Civ.App.1998).
The test results could have significantly affected the resolution of the question whether Dove was guilty. If the results showed that someone else’s DNA was beneath Dixon’s ’fingernails, 'that evidence could have established that Dixon struggled with someone other than Dove. The jury could have found that the person whose DNA was beneath Dixon’s fingernails was the same person who had murdered her. Thus, the test results could have made it far more likely that the jury would have acquitted Dove or, perhaps, would have found him guilty of a lesser offense. If, however, the test results showed the presence of Dove’s DNA, those results could have provided direct evidence implicating Dove, which the State did not otherwise have in this case. Thus, the test results were material and competent. There has been no argument that the evidence would not have been admissible. Therefore, the first Saranthus factor was met.
The State argues, and the trial court found, that the test results were not relevant because Dove had always maintained in his statements that he was the only person- who had been in the apartment with Dixon. Dove claimed in several of his statements that, except for the December 31 visit from Pierce, he and Dixon were the only ones in the apartment, at least until he passed out in his bed around 9:30 or 10:00 p.m. on January 1. In the statements, Dove consistently denied any involvement in Dixon’s death, and he made it clear in his pretrial arguments on this issue that the test results from the analysis of Dixon’s fingernail scrapings might provide evidence to prove that someone else had killed her. Therefore, Dove’s statements to the police did not preclude him from arguing at trial that someone else had killed Dixon, and they did not render the results of the analysis of Dixon’s fingernail scrapings irrelevant.
The second' factor set forth in Saran-thus — the probability that the evidence would be forthcoming if the case were continued — was established in this case. There was no dispute that Dixon’s fingernail clippings had been submitted for testing, and that the analysis of the scrapings from beneath her fingernails had not yet been performed, but that the results would be available in the future.
The third Saranthus factor was. also established. Dove did not fail to exercise due diligence here. The evidence was in the State’s custody and was submitted to DFS for analysis. It was through no fault of Dove’s that the analysis had not been completed and that the test results had not been returned before trial.
Thus, Dove satisfied all the requirements set forth in Saranthus, and, as the Alabama Supreme Court stated in Saran-thus, when a defendant establishes those requirements, the trial court should grant a motion for a continuance. However, as that Court also noted, a trial court’s ruling on a motion to continue will be reversed *893 only when the ruling constitutes an abuse of discretion. See Sullivan v. State, 939 So.2d 58, 66 (Ala.Crim.App.2006) (citing cases in which the denial of a motion'for.a continuance was held to be an abuse of discretion).
“ ‘The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Avery v. Alabama, 308 U.S. 444 [(1940)]. Contrariwise,- a myopic insistence . upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. Chandler v. Fretag, 348 U.S. 3 [(1954)]. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to.the trial judge at the time the . request is denied. Nilva v. United States, 352 U.S. 385 [(1957)]; Torres v. United States, 270 F.2d 252 (C.A. 9th Cir.[1959]); cf. United States v. Arlen, 252 F.2d 491 (C.A.2d Cir.[1958]).’ ”
Sullivan, 939 So.2d at 66-67, quoting Ungar v. Sarafite, 376 U.S. 575, 589-90, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).
Dove’s request for a continuance was justifiable because the analysis of Dixon’s fingernail scrapings had not been performed. The test results could have been exculpatory, and, if that were the case, the State might not have proceeded to trial on the murder charge. If the case had proceeded to trial with .exculpatory test results, the jury might have acquitted Dove or found him guilty of a lesser offense. Even if the test results had indicated that Dove’s DNA was found under Dixon’s fingernails, Dove would have had the opportunity to retain an expert who could have challenged the reliability of the analysis and the results, as well as the credibility of the State’s forensic analyst who would have testified about those results. The .United States Supreme Court, in Hinton v. Alabama, — U.S. -, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014), addressed the importance of defense challenges to . State’s experts:
“Prosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that ‘[s]erious deficiencies have been found in -the forensic evidence used in criminal trials.... One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases.’ Melendez-Diaz v. Massachusetts, 557 U.S. 305, 319, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (citing Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L.Rev. 1, 14 (2009)). This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution’s expert witnesses.... ”
— U.S. at-, 134 S.Ct. at 1089.
Because the. analysis of Dixon’s fingernail scrapings had not. been completed before Dove’s trial began, Dove exercised his only available option, which was to cross-examine the State’s witnesses about the absence of analysis or testing of the fingernail scrapings and of any test results.
*894 Dove cross-examined Dr. John Kroli-kowsk-i, the State’s witness who' performed Dixon’s autopsy: •-
i‘Q. ■ [Dove’s counsel:] Doctor, are you able to‘ tell us from your report what happened to the fingernail clippings of • Ms. Dixon after you did -the autopsy?
“A. [Dr.- Krolikowski:] No, sir,' We gather the fingernail clippings as a part of the autopsy in these kinds of eases. We seal them and we send them to the laboratory.
“Q. And what does the laboratory generally do with the 'fingernails?'
“A. Well, generally, they look for any foreign material, particularly that might yield DNA and to see if the individual who was assaulted might have scraped ■or had materials of-the perpetrator underneath. That’s the primary purpose.
“Q. And you don’t know if that was done in this case or not? -
A. ' My understanding was that' they were going to do it, but whether it was completed or not, I can’t say.”
(R. 274-75.)
Dove also cross-examined Donna Weaver Gibbons," a forensic biologist with DFS who was recognized as an expert in forensic DNA analysis ,and who testified on direct examination that scrapings from Dove’s fingernails did not contain Dixon’s DNA. She testified on direct examination that the Mobile Police Department had resubmitted Dixon’s fingernail scrapings to the laboratory approximately one month before trial and that no results had yet been reported. On cross-examination, Gibbons téstifíed that she did not know why the Mobile Police Department had resubmitted Dixon’s fingernail scrapings to th'e: laboratory. She also testified that she did not know when the analysis on the scrapings would be completed. She testified that fingernail scrapings from a victim are always taken- during an autopsy “in ease: there’s • a struggle and ■ maybe the victim-might have scratched her- assailant.” (R. 262.) Finally,' Gibbons testified that she believed Dixon’s fingernail scrapings were submitted to the laboratory to determine whether any DNA other than Dixon’s was found beneath her nails..
Thus, testimony'from the'State’s witnesses and the' lack' of test results dearly left a crucial gap in the evidence. The jury was aware that Dixon’s fingernail dip-pings had been submitted so the scrapings from beneath the nails could be analyzed for the possible presence of DNA other than her own, which could then possibly establish the -identity of the person with whom Dixon had apparently struggled before she was killed, but the jury knew nothing of the results because the analysis had not yet been completed by DFS. The absence of an analysis left Dove in an untenable position: he was unable either to present evidence of test results that were exculpatory or to challenge the reliability of test results that implicated him or to present his own expert and challenge the credibility of the State’s witness who would have testified about the results. Instead, he was forced simply to cross-examine the State’s witnesses about th'e'-absence of any test results.' Under the circumstances, the absence of the test results allowed the jury to infer that the results would implicate Dove.
Furthermore, in its closing argument, the State called attention to Dove’s questions about Dixon’s fingernail clippings and then argued, that the questions were a ploy to secure an acquittal:
“We don’t have to prove that the— why there’s no fingernail clippings or— -or why DFS didn’t get the report done for the fingernail clippings underneath the victim’s fingers. - That’s not — -we *895 don’t have to’ prove that.. That’s not a part of the elements of the crime.
“That’s something for them to throw at you because they don’t care what you believe. Just don’t believe he’s guilty.’’
(R, 846.) The denial of Dove’s motion for a continuance struck a significant blow to Dove’s ability, and his right, to present a’ defense.
We note, too, that when Dove told the trial court that, because he did not kill Dixon, he was Willing to take the risk that the test results might reveal that his DNA was beneath Dixon’s fingernails, the trial court stated:. “Well, I. think you’re better off with my ruling.” .(R. 44.) However, not only was the trial court’s belief about whether Dove would be “better off ’ irrelevant to the ruling on the motion to continue, the trial court’s belief also amounted to an opinion on trial strategy and was in direct conflict with Dove’s expressed wishes regarding his defense. As the United States Supreme Court stated in Estelle v. Williams, 426 U.S. 601, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976):
“Under our adversary system, once a defendant has the assistance of counsel , the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach .would, rewrite the duties of trial judges and counsel in our legal system.”
426 U.S. at 612.

Conchision

A trial court’s discretionary ruling on a motion for a continuance is reversed only on rare occasions. The circumstances of this case present one of those rare occasions. .For-all the reasons discussed above, we hold that the trial court, exceeded its discretion when -it denied Dove’s motion for a continuance. Accordingly, we reverse the judgment of the trial court, and remand the cause for proceedings consistent with this opinion.
REVERSED AND REMANDED.
•KELLUM, BURKE, and JOINER, JJ., concur. . . •
WINDOM, P.fJ., recuses herself. .