[Cite as *State v. White*, 2024-Ohio-549.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 22CA22 |
| | : | |
| v. | : | |
| | : | DECISION AND |
| Bobby L. B. White, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | **RELEASED 2/8/2024** |

_____

APPEARANCES:

Jerry L. McHenry, Pickerington, Ohio, for Appellant.

Judy C. Wolford, Pickaway County Prosecuting Attorney, and Jayme Hartley Fountain, Assistant Pickaway County Prosecuting Attorney, Circleville, Ohio, for Appellee.

_____

Smith, P.J.

{¶1} Bobby L.B. White, Appellant, appeals from the judgment of the Pickaway County Court of Common Pleas convicting him of one count of murder, an unclassified felony in violation of R.C. 2903.02(A), one count of murder, an unclassified felony in violation of R.C. 2903.02(B), and one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1). On appeal, White contends: 1) that his convictions were against the manifest weight of the evidence and were not supported by sufficient evidence; and 2) that trial counsel rendered ineffective assistance of counsel. However, because we find that White's

convictions were supported by sufficient evidence and were not against the manifest weight of the evidence, his first assignment of error is overruled. Further, because we find that White failed to demonstrate that the allegedly deficient performance by his trial counsel resulted in prejudice to him, he has not demonstrated that his trial counsel rendered ineffective assistance. Thus, his second assignment of error is also overruled. Accordingly, having found no merit in either of the assignments of error raised by White on appeal, the judgment of the trial court is affirmed.

## FACTS

{¶2} On the afternoon of December 25, 2019, at approximately 12:30 or 1:00 p.m., Kenneth and Ruth Tennant left their Pickaway County home and traveled a short distance to their neighbor's house for Christmas dinner. They returned home between 4:00 and 5:00 p.m. to find two dogs with leashes running loose. After putting the dogs into their garage with a plan to try to locate the owner, Ruth saw something lying in the yard, realized it was a deceased person, and she called 911. The deceased person was later identified as Douglas Buechler, the victim herein. White, who was in possession of Buechler's vehicle, was arrested approximately two days later after being stopped by law enforcement while driving the vehicle. White was taken to the police station for questioning

and was arrested after an initial search of the vehicle revealed illegal drugs and drug paraphernalia.

{¶3} Thereafter, on February 6, 2020, Bobby White was indicted on multiple felony counts as follows:

Count 1:    Murder, an unclassified felony in violation of R.C. 2903.02(A);

Count 2:    Murder, an unclassified felony in violation of R.C. 2903.02(B);

Count 3:    Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(1);

Count 4:    Aggravated Trafficking in Drugs, a third-degree felony in violation of R.C. 2925.03(A)(2) and (C)(1)(c); and

Count 5:    Aggravated Possession of Drugs, a third-degree felony in violation of R.C. 2925.11(A) and (C)(1)(b).

The indictment specified that White had knowingly caused serious physical harm and ultimately had purposely caused the death of Douglas Buechler on December 25, 2019. The indictment further alleged that White had both possessed and trafficked methamphetamine in an amount equal to or exceeding the bulk amount, but not exceeding five times the bulk amount.

{¶4} The matter proceeded to a two-day jury trial commencing on November 2, 2020. Although the record does not contain trial transcripts from that trial, it appears that the State voluntarily dismissed Count 4, aggravated trafficking

in drugs, prior to trial and that White was convicted of Count 5, aggravated possession of drugs. The record further indicates that the trial resulted in a hung jury as to Counts 1, 2, and 3. As a result, the trial court declared a mistrial as to those counts of the indictment and proceeded to sentence White to a 36-month prison term on Count 5. White did not appeal that conviction.

{¶5} The prosecution of Counts 1, 2, and 3 resumed nearly one year later with the filing of the State's supplemental discovery on October 25, 2021, disclosing two new witnesses, Nicholas Tootle and Stephanie Adams. Additional discovery was conducted and the matter eventually proceeded to a second jury trial on September 21, 2022. The State presented 11 witnesses at trial and introduced 41 exhibits. The defense presented one witness and introduced five exhibits.

{¶6} A summary of the witness testimony essentially reveals that the victim had been arrested a few days prior to his death and had just been released from jail in Franklin County, Ohio on the morning of his murder. His friend Steven Hughes picked him up from jail and another friend, White (who was in possession of the victim's vehicle since the time of his arrest), drove the victim's car to Columbus at approximately 12:30 or 1:00 p.m. to pick him up from Hughes' house. White and the victim, as well as the victim's dogs, drove around the Columbus area for some time looking for drugs and then headed to Circleville, Ohio.

{¶7}  White claimed that the two of them left the Columbus area sometime between 3:30 and 5:30 p.m. and that he dropped the victim off on the south side of Circleville with his dogs in order for the victim to go see his ex-girlfriend, Sarah Kinser (who White believed to be named Ann).  White claimed he never saw the victim after that.  However, the victim was found deceased in the Tennant's yard, which was located in Ashville, Ohio, to the north of Circleville sometime between 4:00 and 5:00 p.m.  Items found at the scene of the murder were eventually linked to White.

{¶8}  More specifically, the State's witnesses included Ruth Tennant, Brooke Cano of the Pickaway County Sheriff's Office, Robert Radcliffe, the Pickaway County Sheriff, Dr. John Ellis, the Pickaway County Coroner, Detective Sergeant Tracy Andrews of the Pickaway County Sheriff's Office, Steven Hughes, Special Agent Chad Holcomb from the Ohio Bureau of Criminal Investigation (hereafter "BCI"), Trent Banks, who was White's former boss and friend, Sarah Kinser, Erica Jiminez, a forensic scientist from BCI, and Nicholas Tootle, a witness that was newly discovered after the conclusion of the first jury trial.

{¶9}  As stated, Ruth Tennant testified that she discovered the victim's body lying in her front yard and covered in blood just as it was getting dark.  She also discovered what was later determined to be the victim's dogs running around with their leashes still attached.  She testified that she observed a bloody handprint on

her garage door and that flower pots were knocked over. She testified that the victim's throat had been slit.

{¶10} Brooke Cano was the law enforcement officer initially dispatched to the scene at approximately 4:15 p.m. She arrived to find the victim not breathing, with trauma to this throat, several lacerations, and his clothing all displaced. She found a hat lying in the flower bed, a pool of blood by the hat, and also a pair of green glasses lying on the side of the garage near where the bloody handprint was on the garage door. On cross examination, defense counsel questioned Cano regarding the victim's clothing and nail color, to which Cano responded that the victim appeared to be wearing women's yellow lace underwear and that his fingernails were painted different colors. She testified that the detectives took over the scene when they arrived.

{¶11} Robert Radcliffe, the Pickaway County Sheriff, testified that he responded to the scene and assisted Detective Rex Emrick in collecting items of evidence.[1] He testified that they found a black baseball cap with the letters WTK on it near the broken flower pots. He testified that they also located a Marlboro cigarette butt with blood on it, as well as a pair of green-rimmed glasses. He further testified that they found court documents in the victim's pocket with the

---

[1] Radcliffe testified that because Emrick later contracted COVID-19 and died as a result, he was not available for trial.

name Douglas Buechler, as well as a piece of paper with a phone number, which was later traced to White.

{¶12} Radcliffe testified that several swabs of blood were collected and that the victim's body was taken by the coroner, who identified the victim as Douglas Buechler the next day. As a result, Radcliffe contacted the victim's mother, who provided him with the victim's vehicle information. Radcliffe explained that law enforcement began looking for the vehicle and ultimately found the vehicle parked in Ashville, Ohio at approximately 9:00 a.m. on the morning of December 26, 2019. Law enforcement watched the car until 5:00 a.m. the next morning when White was observed getting into the vehicle and driving away. The vehicle was stopped, White was read his rights and was taken in for questioning, and the vehicle was taken to the Pickaway County Sheriff's Office to be searched by BCI.

{¶13} Dr. John Ellis, Pickaway County Coroner, also testified. He testified that the victim sustained multiple sharp point injuries, or stab wounds, some of which were defensive wounds. He testified that there was a great amount of blood present at the scene and that blood was scattered in the immediate area. Ellis testified that the victim's body was sent to the Montgomery County Coroner's office for an autopsy, where it was determined that the victim's cause of death was massive acute blood loss caused by multiple sharp force injuries. Ellis stated that close to 40 stab wounds were noted in areas including the victim's chest, abdomen,

back, flank, head, and a large injury on the victim's neck.  On cross examination, Ellis conceded that the type of knife used in the crime could not be determined and that there could have been more than one attacker.

{¶14}  Detective Sergeant Tracy Andrews, who had been employed with the Pickaway County Sheriff's Office for more than 20 years, also testified.  He testified that he assisted in the investigation and learned from the victim's mother that the victim had been in jail for four days prior to his murder and that the victim's friend, Steven Hughes, had picked him up from jail the morning of the murder.  Andrews also testified that the victim's mother informed him the victim had an ex-girlfriend, Sarah Kinser, who had moved to Circleville with her mother, Pamela Caudill.  He explained that Kinser's mother apparently did not approve of the victim and Kinser's relationship.  Andrews also met with Steven Hughes, who informed him that White and the victim left his house in the victim's black Honda Civic, with White driving the car.  Andrews stated that per phone records, the last text sent from the victim's phone was at 2:50 p.m. on December 25, 2019, but that it could not be determined what the text said.

{¶15}  Andrews was recalled by the State later in the trial and during his testimony, the jailhouse video interview of White was played into evidence for the jury.  White's interview was lengthy and is summarized as follows.  White had not known the victim that long and actually thought his name was Danny, not Douglas.

He knew about the victim's ex-girlfriend, but believed her name to be Ann, not Sarah. He was with the victim at the victim's residence the night the victim was arrested and taken to jail. He was given the keys to the victim's car and the victim's dogs by law enforcement at that time. He picked the victim up from Hughes's house on Christmas day and then drove him to four different locations in Columbus looking for drugs before the two decided to head to Circleville to see "Ann" sometime between 3:30 and 5:30 p.m. White dropped the victim off on the south side of Circleville near Christy's Pizza with his dogs so that he could go see "Ann." White texted Hughes at that time and told him that the victim was supposed to text him when he wanted picked up. In his interview, White explained he was driving the car because the victim had no license. He stated that after dropping the victim off, he then went and returned some batteries to an individual by the name of Trent Banks, ended up going to Lancaster to pick up some mail from someone named Jessica, and then slept in the Walmart parking lot in Lancaster that night and never heard from the victim again. White affirmed during the interview that he had a drug addiction and that he had relapsed a month prior. The interview was abruptly stopped when White asked where the victim was and was informed the victim was deceased.

{¶16} Once White's video interview was stopped, Andrews went on to testify that he checked surveillance videos from businesses in the area where White

allegedly dropped the victim, but he was unable to observe the victim or his two dogs in the area. He also testified that he spoke with both Sarah Kinser and Jessica after the interview. Kinser informed Andrews she had not seen the victim since October of 2019. Jessica informed Andrews that she saw White on December 23rd, not December 25th. Andrews also obtained the Ring doorbell video from Trent Banks' residence, which will be discussed below. Andrews testified that it would have been a three to four hour walk from the south side of Circleville to where the victim's body was found at the Tennant residence.

{¶17} On cross-examination, Andrews conceded that people can make mistakes regarding timeframes, that sometimes certain events fall outside of surveillance camera range, that no blood was found on White's clothes or rings, that White had no defensive wounds on his hands, and that several police reports had been made regarding the victim. More specifically, he testified that Sarah Kinser's mother, Pamela Caudill, had obtained a temporary protection order against the victim. Although more will be discussed regarding the newly discovered witness, Nicholas Tootle, Andrews conceded on cross examination that although Tootle reported that White presented to his apartment on Christmas Day with blood on his hands, Tootle's girlfriend at the time, Stephanie Adams, reported that she didn't notice blood on White's hands or clothes when he arrived at their apartment.

{¶18} The victim's friend, Steven Hughes, also testified for the State. Hughes testified that he spoke to the victim several times while he was in jail in Franklin County and that during the calls, the victim was primarily concerned about his dogs and his car. He explained that the victim was concerned that White had his car in Circleville because the victim was not supposed to be near Kinser and Caudill. He testified that the victim had met White on a dating app known as KIK, but that the victim told him he hadn't known White very long. He testified that he picked the victim up from jail on Christmas morning, and then White picked up the victim and his two dogs in the black Honda Civic at about 12:30 or 1:00 p.m. on Christmas Day. Hughes testified that White was wearing a dark colored baseball hat when they drove away. He further testified that he communicated with White at 3:42 p.m. on Christmas Day and that White informed him at that time that the victim wanted to go see Sarah Kinser. Text messages by Hughes to White later that evening around 8:00 p.m. inquiring about the victim went unanswered.

{¶19} Special Agent Chad Holcomb with BCI also testified. He explained that he conducted the search of the victim's vehicle, which he described as "extremely crowded," or dirty, with a lot of trash. During the search, he collected a folding knife, some receipts, and an index card. He testified that there was blood throughout the vehicle. He explained that he used a chemical called Blue Star,

which illuminates blood that is not able to be seen by the naked eye. He testified that photos from the crime scene indicated that the there had been a "blood shedding event," so he looked through the vehicle for blood, which he found. He testified that he collected blood samples from a green towel, the driver's side floor board, the receipt, and the index card. He submitted those items, along with a pubic swab, fingernail swab, and clothing swab of White to BCI for DNA testing. He conceded on cross examination that he found no blood on the steering wheel, no blood on the driver's seat, no blood on the gear shift, and that no areas of the vehicle appeared to have been cleaned. He also conceded on cross examination that suspected blood on the folding knife turned out to be rust, not blood, once it was tested.

{¶20} Trent Banks, White's former employer, also testified for the State. He testified that White came to his job site on December 21, 2019 to return some tools. He testified that White had two dogs with him and was driving a black Honda, which he indicated he had purchased for $500.00. He testified that White later came to his house on the morning of December 24, 2019 to return some batteries. A video clip from Banks' Ring doorbell was played for the jury and depicted White wearing a hat. Banks explained that White had had two or three hats made, but that White had them made for himself and not anyone else, and that if anyone else would have had one, it would have been himself because he was the

closest person to White. On cross examination, Banks testified that he thought White must have gotten a good deal on the car because he had never known him to lie. He also explained that the logo on White's hat was "WTK," which stood for "White Trash Kustomz." On redirect, Banks testified that he had terminated contact with White because he found out White was living a "double life," and that White had deceived him into thinking he was something that he was not. Then, on recross, defense counsel inquired as to whether the "double life" Banks had referenced had anything to do with stealing or being a "cross-dresser," to which Banks responded in the affirmative to the first question and in the negative to the second question.

{¶21} Sarah Kinser also briefly testified. She stated that she was pregnant with the victim's child at the time of the murder, but that she had not seen him since October of 2019. She also testified that she had called the police on the victim when he came to her house in October. She stated that the victim did not come to her house on Christmas Day in 2019.

{¶22} Erica Jiminez, a forensic scientist in the DNA section of BCI, also testified at trial. She provided expert testimony regarding the items of evidence that were sent to BCI for DNA testing. She testified that no blood was identified on the folding knife that was submitted for testing and, therefore, no DNA analysis was performed on that object. She also testified that a towel that was tested was

presumptive positive for blood and it was determined that the victim was the major contributor of DNA on the towel. Another person's DNA was also identified on the towel, but because the amount was so low, it could not be determined whose DNA it was. She further testified that although swabs taken from an index card that was found inside the victim's car were presumptive positive for blood, no DNA analysis was performed because confirmation that the victim's DNA was on the card would not have been meaningful since they were found in his own car. Jiminez also testified that the cigarette butt that was found near the victim's body was presumptive positive for blood and that DNA analysis revealed a mixture of DNA from two individuals. More specifically, she explained that DNA from both White and the victim were present on the cigarette butt, but that she could not determine whether the DNA was from blood or from saliva. With respect to the hat found at the scene of the crime, she testified that White was the major contributor of DNA on a swab taken from the inside rim of the hat. There was also a minor contributor of DNA on the hat, but it could not be determined to whom the DNA belonged.

{¶23} On cross examination, Jiminez conceded that it was not unusual to find an individual's blood in their own vehicle and that the blood could have been in the car from a previous incident. She also conceded that the mixture of DNA on the cigarette could have been the result of White and the victim having shared a

cigarette.  She also conceded that the fact that blood was on the cigarette did not mean that the cigarette was shared at the crime scene.  Jiminez also conceded that none of the victim's DNA was found on White's watch or rings and that none of White's DNA was identified on the scrapings taken from under the victim's fingernails.

{¶24}  Finally, Nicholas Tootle testified on behalf of the State.  He testified that at the time of the murder, he was living with his now ex-girlfriend, Stephanie, in Ashville, Ohio.  He testified that White arrived at his apartment at about 4:00 p.m. on Christmas afternoon, just as it was starting to get dark.  He testified that White's hands were dripping with blood and that White asked for a bowl of bleach so he could clean his rings.  He testified that after cleaning his rings in the kitchen sink, he then went to the bathroom and cleaned himself up.  He stated that he and White then went to Columbus to find drugs and proceeded to hang around the apartment until 8:00 or 9:00 p.m.  He testified that he had not seen White since the morning after Christmas.  He explained that he heard about the murder on the news, but didn't want to get involved.  He stated that he was contacted by police about a year after the murder.  On cross examination, Tootle maintained that White arrived just as the sun was going down, despite being confronted with his prior statement to police that White had arrived a few hours after it had gotten dark.  Further, in response to questioning by defense counsel,

Tootle denied that White had asked to borrow a funnel so that he could add transmission fluid to his car. At that time, Tootle volunteered that he knew the difference between blood and transmission fluid. Tootle admitted on cross examination that he was taking Suboxone and Xanax and was using meth at the time of the event. When asked why his girlfriend, Stephanie, stated she didn't see blood on White's hands, Tootle stated that she was a "false liar."

{¶25} At that point, the State rested and admitted all of its exhibits without objection. Thereafter, the defense called one witness, Detective Tracy Andrews. Defense counsel primarily went over the surveillance camera footage obtained from the south of side of Circleville where the victim was allegedly dropped off. Despite defense counsel's attempts to get Andrews to agree that various people on the video looked like they may have either been the victim with one of his dogs, or Sarah Kinser, Andrews maintained that he was unable to view anyone on the video fitting either description. The defense then rested.

{¶26} White was ultimately found guilty by a jury of all three counts in the indictment and once the offenses were merged for purposes of sentencing, he was sentenced to a term of 15 years to life in prison, along with a mandatory term of post-release control of 5 years. It is from that order that White now brings his timely appeal, setting forth two assignments of error for our review.

ASSIGNMENTS OF ERROR

I.      THE APPELLANT'S CONVICTION WAS AGAINST
        THE MANIFEST WEIGHT OF THE EVIDENCE AND
        WAS    NOT    SUPPORTED    BY    SUFFICIENT
        EVIDENCE.  HE WAS DENIED HIS RIGHTS TO A
        FAIR TRIAL, DUE PROCESS OF LAW AND EQUAL
        PROTECTION OF THE LAW AS GUARANTEED HIM
        BY   THE   FIFTH,   SIXTH   AND   FOURTEENTH
        AMENDMENTS    OF    THE    UNITED    STATES
        CONSTITUTION AND ARTICLE I, SECTION 10 OF
        THE OHIO CONSTITUTION.

II.     TRIAL    COUNSEL    RENDERED    INEFFECTIVE
        ASSISTANCE OF COUNSEL BY FAILING TO FILE
        ANY  PRE-TRIAL  MOTIONS,  FAILING  TO  RAISE
        OBJECTIONS,    ELICITING    INFORMATION    ON
        CROSS-EXAMINATION    WHICH    SHOWED    HIS
        CLIENT IN A NEGATIVE LIGHT, AND FAILING TO
        MOVE FOR A DIRECTED VERDICT OF ACQUITTAL
        UNDER CRIMINAL R. 29.  THIS DEPRIVED THE
        APPELLANT  OF  EFFECTIVE  ASSISTANCE  OF
        COUNSEL,   A   FAIR   TRIAL   AND   EQUAL
        PROTECTION OF THE LAW, AS GUARANTEED
        HIM BY THE FIFTH, SIXTH AND FOURTEENTH
        AMENDMENTS    OF    THE    UNITED    STATES
        CONSTITUTION, AND ARTICLE I, SECTION 10 OF
        THE OHIO CONSTITUTION.

ASSIGNMENT OF ERROR I

{¶27}  In his first assignment of error, White contends that his convictions were against the manifest weight of the evidence and were not supported by sufficient evidence.  White argues that his convictions were based entirely upon circumstantial evidence and the jury had to engage in impermissible inference stacking to arrive at a guilty verdict.  He also argues that the jury's inferences

could just have easily been drawn in favor of innocence rather than guilt and that

none of the evidence presented by the State was actual evidence of murder. He

also appears to challenge the jury's reliance on Tootle's testimony that White

arrived at his apartment with blood on his hands, as Tootle was not an expert

witness. The State responds by arguing that considering the totality of the

evidence, the jury did not lose its way and White's convictions were not against the

manifest weight of the evidence.

Standard of Review

{¶28} A claim of insufficient evidence invokes a due process concern and

raises a question of whether the evidence is legally sufficient to support the verdict

as a matter of law. *See State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d

541 (1997). "Whether the evidence is legally sufficient to sustain a verdict is a

question of law." *Id.* "Therefore, our review is de novo." *State v. Groce*, 163

Ohio St.3d 387, 2020-Ohio-6671, 170 N.E.3d 813, ¶ 7, citing *In re J.V.*, 134 Ohio

St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 3.

{¶29} When reviewing the sufficiency of the evidence, our inquiry focuses

primarily upon the adequacy of the evidence; that is, whether the evidence, if

believed, reasonably could support a finding of guilt beyond a reasonable doubt.

*Thompkins* at syllabus. The standard of review is whether, after viewing the

probative evidence and inferences reasonably drawn therefrom in the light most

favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390 (Cook, J., concurring).

{¶30} Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *See State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶31} However, when an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence and all reasonable inferences, and consider the witness credibility. *See State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 151; citing *State v. Thompkins*, *supra*, at 387. A reviewing court must

bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *See State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008-Ohio-1744, ¶ 31. " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.' " *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, quoting *State v. Konya*, 2nd Dist. Montgomery No. 21434, 2006-Ohio-6312, ¶ 6, in turn quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). As the Court explained in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517:

> " '[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts.
>
> * * *
>
> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' "

*Eastley, supra* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, FN. 3 (1984), in turn quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, 191-192 (1978).

{¶32} Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact-finder, as long as a rational basis exists in the record for its decision. *See State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012-Ohio-1282, ¶ 24; *see also State v. Howard*, 4th Dist. Ross No. 07CA2948, 2007-Ohio-6331, ¶ 6 ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight").

{¶33} Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). *See also Thompkins, supra*, at 387. If the prosecution presented substantial credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *See State v. Eley*, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997); *see also Eastley* at ¶ 12 and *Thompkins* at 387 (explaining that a judgment is not against the manifest weight of the evidence when "the greater amount of credible evidence" supports it). Thus, " '[w]hen

conflicting evidence is presented at trial, a conviction is not against the manifest

weight of the evidence simply because the jury believed the prosecution

testimony.' " *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d

493, ¶ 17 (4th Dist.), quoting *State v. Mason*, 9th Dist. Summit No. 21397, 2003-

Ohio-5785, ¶ 17.  Instead, a reviewing court should find a conviction against the

manifest weight of the evidence only in the " ' "exceptional case in which the

evidence weighs heavily against the conviction." ' " *State v. Lindsey*, 87 Ohio

St.3d 479, 483, 721 N.E.2d 995 (2000), quoting *Thompkins* at 387, in turn quoting

*Martin* at 175.

Legal Analysis

{¶34}  The record before us indicates that White was convicted of murder,

felony murder, and felonious assault, as charged in the indictment.  R.C. 2903.02

states in section (A), in reference to the offense of murder, that "[n]o person shall

purposely cause the death of another or the unlawful termination of another's

pregnancy."  R.C. 2901.22(A) defines "purposeful" conduct as:

> [a] person acts purposely when it is the person's specific intention
> to cause a certain result, or, when the gist of the offense is a
> prohibition against conduct of a certain nature, regardless of what
> the offender intends to accomplish thereby, it is the offender's
> specific intention to engage in conduct of that nature.

R.C. 2903.02 also states in section (B), in reference to the offense of felony

murder, as follows:

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

{¶35} The Supreme Court of Ohio has held that the culpable mental state required to support a conviction under R.C. 2903.02(B) is the same one necessary to support a conviction for the underlying felony offense of violence. *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 31-34. In this case, the underlying felony offense of violence was felonious assault, as charged in Count 3 of the indictment. R.C. 2903.11 defines the offense of felonious assault and provides in section (A)(1) that "[n]o person shall knowingly * * * cause serious physical harm to another * * *." Further, R.C. 2901.22(B) provides as follows regarding the mental state of "knowingly":

A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

{¶36} Many of White's arguments challenge the credibility of the evidence presented at trial. For instance, White challenges the veracity of Sarah Kinser's testimony that she did not see the victim on the date of the murder. The defense theory at trial was that both Kinser and her mother hated the victim and were likely involved in his murder. White also challenges Tootle's testimony that White

showed up at his apartment on Christmas Day with blood on his hands, asked for bleach to clean his rings, and used his bathroom to clean himself up. White essentially argues that because Tootle did not initially come forward with information, but instead, waited until he was contacted by law enforcement a year later, the testimony is suspect and should not be believed.

{¶37} Other arguments raised by White challenge the weight to be afforded certain evidence. For instance, White contends that the jury could have drawn inferences of innocence from the blood and DNA evidence introduced by the State. White also argues that his convictions were based upon circumstantial evidence only and that there was no solid, direct evidence that he murdered the victim. He argues that the presence of the WTK hat and cigarette butt at the murder scene were not evidence of murder and that in order to find them to be evidence of murder, that the jury would have had to stack inference upon inference to arrive at that result. The defense theory at trial was that because White and the victim were riding around in the victim's car all day, and that because the victim was an IV drug user, there should be no surprise that the victim's blood was found on his car door, floor board, and a towel inside his car. The defense's theory at trial also included arguments that the presence of White's DNA on a cigarette butt and a WTK hat found at the scene had little significance as the two likely had shared cigarettes and because there was more than one of the WTK hats in existence.

{¶38} As set forth above, however, when reviewing whether a conviction is supported by sufficient evidence, it is not this Court's role to question whether the evidence is to be believed, but rather, we must consider whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. Furthermore, in our consideration, we must view the evidence in a light most favorable to the prosecution.

{¶39} Additionally, with respect to White's arguments related to circumstantial evidence and inference stacking, we initially note that circumstantial evidence has equal probative value to direct evidence. *See State v. Jenks*, *supra*, at paragraph one of the syllabus. We are also mindful that "[a] trier of fact may not draw '[a]n inference based * * * entirely upon another inference, unsupported by any additional fact or another inference from other facts[.]' " *State v. Cowans*, 87 Ohio St.3d 68, 78, 717 N.E.2d 298 (1999), quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 130 N.E.2d 820 (1955), paragraph one of the syllabus. "When an inference, which forms the basis of a conviction, is drawn solely from another inference and that inference is not supported by any additional facts or inferences drawn from other established facts, the conviction is improper." *State v. Armstrong*, 11th Dist. Portage No. 2015-P-0075, 2016-Ohio-7841, ¶ 23, citing *State v. Payne*, 11th Dist. Ashtabula No. 2014-

A-0001, 2014-Ohio-4304, ¶ 23.  *See also State v. Maynard*, 10th Dist. Franklin No.

11AP-697, 2012-Ohio-2946, ¶ 27.

> The rule against inference-stacking essentially forbids the drawing of an inference from evidence which is too uncertain or speculative or which raises merely a possibility or conjecture. While reasonable inferences may be drawn from the facts and conditions established, they cannot be drawn from facts or conditions merely assumed.

*Armstrong* at ¶ 23.  *See generally Ray v. Wal–Mart Stores, Inc.*, 2013-Ohio-2684,

993 N.E.2d 808, ¶ 35 (4th Dist.) (discussing improper inference stacking).

{¶40}  "Though widely denounced by both courts and legal commentators,

the rule prohibiting the stacking of one inference upon another is still recognized in

Ohio."  *Donaldson v. N. Trading Co.*, 82 Ohio App.3d 476, 481, 612 N.E.2d 754

(10th Dist.1992), citing *Motorists Mut. Ins. Co. v. Hamilton Twp. Trustees*, 28

Ohio St.3d 13, 502 N.E.2d 204 (1986).  *See also State ex rel. Verhovec v. Marietta*,

4th Dist. Washington Nos. 11CA29, 2013-Ohio-5414, ¶ 59.  However, "the rule

has very limited application.  It prohibits only the drawing of one inference solely

and entirely from another inference, where that inference is unsupported by any

additional facts or inferences drawn from other facts."  *Id.*, citing *Hurt*, *supra*, at

paragraph one the syllabus.  As the Court in *Motorists* warned:  "the rule

forbidding the stacking of an inference upon an inference is disfavored by scholars

and many courts.  If such a rule were uniformly enforced, '* * * hardly a single

trial could be adequately prosecuted.' "  *Motorists* at 207, quoting 1A Wigmore,

Evidence (Tillers Rev. 1983) 1106, 1111, Section 41; *United States v. Eustace*, 423 F.2d 569, 571 (2nd Cir. 1970); *see also Verhovec* at ¶ 60.

{¶41} "An inference which is based solely and entirely upon another inference and which is unsupported by any additional fact or another inference from other facts is an inference upon an inference and is universally condemned." *Hurt* at paragraph two of the syllabus. However, there are two instances when the rule against inference stacking does not apply. The first is when "[a]n inference which is based in part upon another inference and in part upon factual support is called a parallel inference and is universally approved provided it is a reasonable conclusion for the jury to deduce." *Id.* at paragraph three of the syllabus. The second is when multiple inferences arise separately from the same set of facts. *McDougall v. Glenn Cartage Co.*, 169 Ohio St. 522, 160 N.E.2d 266 (1959), paragraph two of the syllabus.

{¶42} The evidence introduced by the State at trial established that White and the victim were friends who had only known each other a short time. Because White was with the victim at the victim's apartment when he was arrested, White was given the keys to the victim's car, as well as the victim's dogs, by law enforcement. Although White subsequently dropped the dogs off at Steven Hughes' house, he retained the victim's vehicle and drove it around the Circleville, Ohio area, where he apparently had ties, despite the victim's concern about his

vehicle being in the vicinity of his ex-girlfriend and her mother, who had protection orders against him. During the several days that White had the victim's car while he was in jail in Franklin County, White made representations that he owned the car and was seen wearing one of the few "WTK" hats ever created, known to be designed and worn essentially only by him.

{¶43} The evidence introduced by the State also established that once the victim was released from jail and initially picked up by his friend, Steven Hughes, White drove the victim's vehicle to Columbus to pick up both the victim and his dogs on Christmas Day. Per Hughes, White was wearing a dark-colored baseball hat. White and victim left, per the interview of White himself at the police station, and drove around the Columbus area looking for drugs and then headed towards Circleville, Ohio sometime between 3:30 and 5:30 p.m. Although White claims to have let the victim and his dogs out of the car on the south side of Circleville to go find Sarah Kinser, Sarah Kinser testified that she never saw the victim that day and the victim and his dogs could not be identified on surveillance videos obtained from the businesses in the area. Moreover, the victim's body was found at 4:15 p.m. in the front yard of an Ashville residence, the location of which was estimated to be a three to four hour walk from where White claimed to have dropped the victim off.

{¶44}  Finally, the victim was found with over forty stab wounds.  Near the body was a cigarette butt that ultimately was found to contain DNA from both the victim and White.  A baseball hat with the letters WTK was also located near the victim's body and it was later found to contain only the DNA of White on the inside rim.  The area where the body was found contained evidence of a struggle, including broken and knocked over flower pots, large amounts of blood strewn about, and the victim was observed to have defensive wounds on his hands.  Furthermore, White was found still in possession of the victim's car in the Ashville area thirty-six hours later.  The BCI investigation of the vehicle established that the victim's blood was found on the inside drivers' side door, the drivers' side floormat, and on a towel located inside the vehicle.  Most importantly, Nicholas Tootle testified that just as it was getting dark on Christmas Day of 2019, White showed up at his Ashville apartment with blood on his hands, asked to borrow bleach to clean his rings, and then used his bathroom to clean up.

{¶45}  As stated, White essentially challenges the weight and credibility determinations made by the jury.  Further, White argues that Tootle, "in essence," was permitted to testify as an expert to the extent he claimed that the substance on White's hands was blood.  White argues that "the jury was required to believe that what he claimed to have seen was in fact blood, to further infer that it was

Buechler's blood, and then to infer that it was on Appellant's hands because he killed Buechler."

{¶46} However, despite White's arguments that the evidence introduced by the State was circumstantial, unreliable, or lacked credibility, the jury was free to accept or reject the testimony of the State's witnesses and was also free to make credibility determinations favoring the State's witnesses. Therefore, it was within the province of the jury, as the finder of fact, to determine the weight to be afforded to the State's evidence, including the testimony of both Kinser and Tootle, as well as the forensic testimony related to the DNA evidence, or lack thereof, found at the scene of the murder and subsequently found in the car at the time White was located. This is also true for Tootle's testimony regarding White having blood on his hands.

{¶47} Further, we reject White's argument that the jury had to engage in inference stacking with respect to Tootle's testimony about White having blood on his hands. White argues that "[b]ecause Tootle wasn't an expert on what was blood, whatever Appellant may have had on his hands could have been transmission fluid, paint, or pop." However, there was no evidence in the record tending toward the inference that the substance on White's hands was transmission fluid, paint, or pop. The only reference to transmission fluid came from defense counsel's suggestion that White asked Tootle if he could borrow a funnel to add

transmission fluid to his car. However, Tootle denied that this happened. He also denied that White was working on his car in the parking lot of the apartments. Thus, there were no facts in evidence to support such an inference. However, facts that were in evidence included that White had just been with the victim, that White was the last person to see the victim alive, that White's DNA was found at the crime scene, that the victim was murdered in what was described as a "blood shedding" event, that White showed up at Tootle's apartment at a timeframe consistent with when he likely had just left the crime scene, that White was in possession of the victim's car after the victim was found deceased, and that the victim's blood was found on items located inside the car. Moreover, as conceded by White, no objection was made to Tootle's testimony.

{¶48} Based upon the record before us, we simply cannot conclude that the jury lost its way or that this case constitutes an exceptional case where the evidence weighs heavily against the conviction. Furthermore, we cannot conclude that the jury had to engage in impermissible inference stacking in order to reach a guilty verdict. As set forth above, circumstantial evidence has equal probative value to direct evidence and, as such, it does not appear the jury had to stack inferences to reach its verdict. Instead, we conclude that here, the evidence presented by the State at trial, if believed, could support a finding of guilt beyond a reasonable doubt. The jury was in the best position to hear the testimony, observe

the witnesses and evidence, and determine their reliability. Thus, we hold that the jury's determinations that White was guilty of murder, felony murder, and felonious assault were supported by sufficient evidence and were not against the manifest weight of the evidence. Accordingly, we find no merit to the arguments raised under White's first assignment of error.

## ASSIGNMENT OF ERROR II

{¶49} In his second assignment of error, White contends that his trial counsel provided ineffective assistance by: 1) failing to file any pre-trial motions; 2) failing to raise objections, 3) eliciting information on cross-examination which showed his client in a negative light; and 4) failing to move for a "directed verdict of acquittal under Criminal R. 29." However, although he raises these four arguments in his assignment of error, the body of his brief does not specify what pre-trial motions should have been filed and it makes no argument regarding that issue. Further, the body of his brief contains no argument related to the failure to file a Crim.R. 29 motion.

{¶50} The body of his brief does, however, additionally argue that counsel was ineffective for failing to procure the transcript from the first trial to the extent it contained the prior testimony of key witness, Nicholas Tootle. His brief additionally argues that trial counsel was ineffective as a result of statements he made during closing arguments. As such we will address White's arguments

regarding trial counsel's failure to obtain transcripts of prior testimony of Tootle, trial counsel's failure to object, trial counsel's performance during cross-examination, and trial counsel's statements during closing argument. We will not address issues related to the failure to file pre-trial motions or the failure to file a Crim.R. 29 motion.

Standard of Review

{¶51} To establish constitutionally ineffective assistance of counsel, a criminal defendant must show (1) that his or her counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him or her of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). *Accord State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. Further, "[t]o show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* "Failure to establish either element is fatal to the claim." *State v. Jones*, 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14.

{¶52} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland* at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Quotation omitted). *Id.* " 'A properly licensed attorney is presumed to execute his [or her] duties in an ethical and competent manner.' " *State v. Taylor*, 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, quoting *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 61.

{¶53} "Furthermore, courts may not simply assume the existence of prejudice, but must require that prejudice be affirmatively demonstrated." *State v. Walters*, 4th Dist. Washington Nos. 13CA33, 13CA36, 2014-Ohio-4966, ¶ 24; *State v. Jones*, 2018-Ohio-239, 104 N.E.3d 34, ¶ 21-24 (4th Dist.). We have repeatedly recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim. *See, e.g., State v. Dailey*,

4th Dist. Adams No. 18CA1059, 2018-Ohio-4315, ¶ 33 and cases cited therein;

*State v. Thacker*, 4th Dist. Lawrence No. 19CA18, 2021-Ohio-2726, ¶ 54-57.

Legal Analysis

{¶54} Generally, a defendant has no constitutional right to determine trial

tactics and strategy of counsel. *See State v. Groves*, 4th Dist. Scioto No.

20CA3904, 2022-Ohio-443, ¶ 58; *State v. Cowans*, 87 Ohio St.3d 68, 72, 717

N.E.2d 298 (1999); *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842

N.E.2d 996, ¶ 150. " 'When there is no demonstration counsel failed to research

the facts or the law or counsel was ignorant of a crucial defense, a reviewing court

defers to counsel's judgment in the matter.' " *Crank* at ¶ 18, quoting *State v.

Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶55} At trial, witness presentation, questioning, and cross-examination

usually falls within the ambit of trial strategy. Furthermore, debatable trial tactics

do not generally establish ineffective assistance of counsel. *See Groves, supra*;

*State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45.

> "[T]he failure to object to error, alone, is not enough to sustain a
> claim of ineffective assistance of counsel. To prevail on such a
> claim, a defendant must first show that there was a substantial
> violation of any of defense counsel's essential duties to [the
> defendant] and, second, that [the defendant] was materially
> prejudiced by counsel's ineffectiveness."

*State v. Moore*, 4th Dist. Pickaway No. 20CA10, 2021-Ohio-4414, ¶ 15, quoting

*State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988).

Moreover, the Supreme Court of Ohio has observed as follows:

> Experienced attorneys "learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." (Omissions sic).

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006).

### Failure to obtain prior transcript of Tootle's testimony

{¶56} First, White represents to this Court that Nicholas Tootle "testified in the first trial." He contends that trial counsel was ineffective for failing to attempt to procure a copy of the trial transcript containing Tootle's prior testimony, arguing that Tootle's "prior recorded testimony would have been invaluable to aid Defense counsel in Tootle's cross-examination." The State responds by asserting that Tootle did not testify during the first trial. The State contends that it was not discovered that Tootle had information about the case until after the first trial had resulted in a hung jury.

{¶57} This Court has no way to determine this question in the absence of a copy of the transcript from the first trial. However, that case was never appealed and it does not appear a trial transcript was ever generated. Of importance, White

has not filed a reply brief or otherwise rebutted the State's argument in any way. In fact, White appeared to concede during trial that law enforcement did not speak with Tootle until a year after the murder. The victim was murdered on Christmas Day in 2019 and White was brought to trial on November 2, 2020. Thus, it appears that White is simply mistaken regarding his belief that Tootle testified at the first trial. While we have a lack of evidence on this particular question in the record before us on appeal, the evidence that we do have is consistent with the State's assertion that Tootle was not a witness in the first trial. Thus, we find no merit to this portion of White's second assignment of error.

### Failure to Raise Objections and Eliciting Harmful Responses on Cross Examination

{¶58} White first argues that counsel was ineffective for failing to object to testimony by Steven Hughes indicating that White and the victim met on a dating app named KIK, that the victim did not believe that White's real name was Bobby, and also for eliciting testimony during the cross examination of Brooke Cano that the victim was found deceased and wearing women's lace underwear with his fingernails painted different colors. White also argues that trial counsel was ineffective based upon his questioning of Trent Banks as to whether Banks had learned that White may be a cross-dresser. He contends that "[t]his set the stage for the jury to draw an inference that Decedent and Appellant were engaged in

some sort of romantic or sexual relationship[,]" which "more conservative jurors might have been likely to see such a relationship to be somehow deviant or perverted." He also argues that "* * * it helped provide a motive for a homicide; the motive being 'a lover's quarrel gone awry.' "

{¶59} However, it is clear, reading the trial transcript as a whole, that defense counsel intentionally and consistently tried to bring out facts related to the victim's apparent sexual proclivities by drawing out testimony related to "cross-dressing," such as the fact that the victim was wearing women's underwear and had his nails painted. Defense counsel insinuated to the jury several times that the victim clearly had other things going on in his life along these lines, that possibly had him engaging with different groups of people that may have endangered him in some way. The suggestion was also made that Sarah Kinser and her mother, having filed prior police reports and having obtained a protection order against him, may have had a motive to kill the victim.

{¶60} It appears that trial counsel, throughout the trial, was trying to establish that other known or unknown individuals may have had a motive to harm the victim. Defense counsel established that the victim was wearing women's clothing and had his nails painted, not White. Defense counsel questioned Banks if he had heard that White was a "cross-dresser," to which Banks responded he had not. All of this appears to have been trial strategy. Further, with respect to trial

counsel's failure to object to Hughes' testimony about White and the victim having met on a dating app, this testimony by Hughes was the only actual evidence introduced during trial indicating that White and the victim's relationship was anything other than a brief friendship. Trial counsel likely elected not to object to Hughes' answer so as not to draw more attention to that information. Sound trial strategy often involves downplaying certain testimony, or in some cases, bringing out harmful facts on one's own terms and for one's own purposes. Further, even if trial counsel had objected, it likely would have only called attention to this unfavorable testimony.

{¶61} "[I]t is well-established that '[c]ompetent counsel may reasonably hesitate to object [to errors] in the jury's presence because objections may be considered bothersome by the jury and may tend to interrupt the flow of a trial.' " *State v. Miku*, 2018-Ohio-1584, 111 N.E.3d 558, ¶ 65 (5th Dist.), quoting *State v. Rogers*, 9th Dist. Summit No. 19176, 1999 WL 239100, citing *State v. Campbell*, 69 Ohio St.3d 38, 53, 630 N.E.2d 339 (1994). Furthermore, " ' " '[a] competent trial attorney might well eschew objecting * * * in order to minimize jury attention to the damaging material.' " ' " *State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 70, quoting *State v. Topping*, 4th Dist. No. 11CA6, 2012-Ohio-5617, at ¶ 80, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 90, in turn quoting *United States v. Payne*, 741 F.2d

887, 891 (7th Cir. 1984). For these reasons, we find no merit to these particular arguments raised under White's second assignment of error.

{¶62} White next argues that trial counsel provided ineffective assistance by failing to object to Trent Banks' testimony that White claimed to have purchased the Honda Civic he was driving, which was the victim's car, for $500. White claims that counsel should have objected to this testimony not only because it was hearsay, but because "[i]t only made Appellant to be a liar as to his ownership and the unbelievable purchase price." White also challenges trial counsel's decision to question Banks on cross-examination as to his prior comment that White was living a "double life." More specifically, White argues that counsel's decision to ask Banks if the "double life" involved White either "stealing," drug use, or being a "cross-dresser" constituted deficient and prejudicial performance.

{¶63} However, similar to our analysis above, electing not to object to Banks' testimony regarding White's claim of purchasing and owning the car was likely trial strategy and/or an attempt to minimize the focus on the testimony. Further, although we agree with White's argument that trial counsel's questions regarding theft, drug use, and cross-dressing put to Banks on cross-examination constituted deficient performance, we cannot conclude that these actions changed the outcome of trial and thus, they were not prejudicial. As set forth above, we

have already determined that White's convictions were supported by sufficient

evidence and were not against the manifest weight of the evidence.  Trial counsel's

posing of these questions did not change the result of the trial.

Statements Made During Closing Arguments

{¶64}  Finally, White contends that trial counsel was further deficient in

closing argument, arguing that counsel emphasized a possible "dating relationship"

between the victim and White and commented upon drug usage by both of the

men.  A review of the closing arguments reveals that defense counsel commented

upon the fact that the victim was wearing women's clothes at the time he was

arrested, had "funny underwear" on, and had his nails painted.  Counsel then

commented upon "[d]rug usage probably by the both of them."  Counsel then

commented that "lifestyle" is something that can be considered in terms of motive

and that White had no reason to kill the victim.  Defense counsel also brought up

the animosity between the victim and Kinser and her mother, ultimately arguing as

follows:

> My colleague pointed out, you know, we're home eating and
> having a family dinner.  But look at that group of people that's
> hanging out in that station down there and doing whatever.
> There's other stuff going on Christmas day that we aren't
> involved in.  But certain groups of people, I don't know whether
> it involved Sarah, involved cross dressing, it involved whatever,
> but why would Bobby do it?  Bobby had the car.  Bobby could
> get drugs.  That's just – they don't have to prove motive, but
> you've got to look at why a person would do that.

It was also argued in closing argument that "[s]omebody hated him, somebody hated him, it's a hate killing. He slit his throat, and then he kept stabbing him. I think it was more than one person, because I don't think one person could do that, I think." Counsel went on to suggest this was a crime of passion.

{¶65} Generally, "[c]ounsel's decision on whether to give an opening statement or closing argument and how to formulate and deliver them are tactical decisions." *See State v. Guysinger*, 4th Dist. Ross No. 15CA3514, 2017-Ohio-1167, ¶ 34; *State v. Fouts*, 4th Dist. Washington No. 15CA25, 2016-Ohio-1104, ¶ 69, citing *State v. Bradley*, 42 Ohio St.3d 136, 144, 538 N.E.2d 373 (1989) (rejecting defendant's ineffective assistance of counsel claim that his counsel's closing argument was "too brief, passionless and themeless"). Normally "[t]he substance of closing argument falls within the realm of trial strategy." *State v. Cameron*, 10th Dist. Franklin No. 09AP-56, 2009-Ohio-6479, ¶ 31. Further, it is well settled that statements of counsel are not to be considered as evidence. *See State v. Clark*, 4th Dist. Highland No. 15CA12, 2016-Ohio-2705, ¶ 45; *State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 23.

{¶66} Here, the jury was instructed as follows:

Evidence does not include any statement of counsel made during the trial, unless such statement was an admission or agreement admitting certain facts. The opening statements and the closing arguments of counsel are designed to assist you, but they are not evidence.

Additionally, and importantly, " '[a] presumption always exists that the jury has followed the instructions given to it by the trial court.' " *State v. Murphy*, 4th Dist. Scioto No. 09CA3311, 2010-Ohio-5031, ¶ 81, quoting *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph four of the syllabus.

{¶67} After reviewing the closing argument in full, we do not believe counsel's performance during closing argument was deficient. The fact that White had a drug problem was already in evidence. Further, as set forth above, counsel's statements during closing argument related to "cross-dressing," etc., were consistent with the defense theory throughout, being that the victim was entangled with some other groups of people, separate and apart from White, who may have sought to do him harm. This was a matter of trial strategy. Moreover, even if the statements could have been considered to have constituted deficient performance, the jury was instructed that statements of counsel made during closing arguments are not evidence, and we must presume the jury followed the instructions provided by the trial court. Thus, we find no merit to the arguments raised under this portion of White's second assignment of error. Further, having found no merit to any of the arguments raised under White's second assignment of error, we cannot conclude that White has established deficient performance on the part of his trial counsel that would have resulted in a different outcome at trial, or that he received

ineffective assistance of trial counsel.  Thus, White's second assignment of error is overruled.

{¶68}  Accordingly, having found no merit to either of the assignments of error raised by White on appeal, both of his assignments of error have been overruled and the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J., & Hess, J., Concur in Judgment and Opinion.


For the Court,

_____
Jason P. Smith
Presiding Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**