# SUPREME COURT OF THE UNITED STATES

### ANTHONY RAY HINTON *v.* ALABAMA

ON PETITION FOR WRIT OF CERTIORARI TO THE
COURT OF CRIMINAL APPEALS OF ALABAMA

No. 13–6440   Decided February 24, 2014

PER CURIAM.

In *Strickland* v. *Washington*, 466 U. S. 668 (1984), we held that a criminal defendant's Sixth Amendment right to counsel is violated if his trial attorney's performance falls below an objective standard of reasonableness and if there is a reasonable probability that the result of the trial would have been different absent the deficient act or omission. *Id.,* at 687–688, 694. Anthony Ray Hinton, an inmate on Alabama's death row, asks us to decide whether the Alabama courts correctly applied *Strickland* to his case. We conclude that they did not and hold that Hinton's trial attorney rendered constitutionally deficient performance. We vacate the lower court's judgment and remand the case for reconsideration of whether the attorney's deficient performance was prejudicial.

## I
### A

In February 1985, a restaurant manager in Birmingham was shot to death in the course of an after-hours robbery of his restaurant. A second manager was murdered during a very similar robbery of another restaurant in July. Then, later in July, a restaurant manager named Smotherman survived another similar robbery-shooting. During each crime, the robber fired two .38 caliber bullets; all six bullets were recovered by police investigators. Smotherman described his assailant to the police, and when the police showed him a photographic array, he picked out Hinton's picture.

Per Curiam

The police arrested Hinton and recovered from his house a .38 caliber revolver belonging to his mother, who shared the house with him. After analyzing the six bullets fired during the three crimes and test-firing the revolver, examiners at the State's Department of Forensic Sciences concluded that the six bullets had all been fired from the same gun: the revolver found at Hinton's house. Hinton was charged with two counts of capital murder for the killings during the first two robberies. He was not charged in connection with the third robbery (that is, the Smotherman robbery).

At trial, the State's strategy was to link Hinton to the Smotherman robbery through eyewitness testimony and forensic evidence about the bullets fired at Smotherman and then to persuade the jury that, in light of the similarity of the three crimes and forensic analysis of the bullets and the Hinton revolver, Hinton must also have committed the two murders. Smotherman identified Hinton as the man who robbed his restaurant and tried to kill him, and two other witnesses provided testimony that tended to link Hinton to the Smotherman robbery. Hinton maintained that he was innocent and that Smotherman had misidentified him. In support of that defense, Hinton presented witnesses who testified in support of his alibi that he was at work at a warehouse at the time of the Smotherman robbery. See 548 So. 2d 562, 568–569 (Ala. 1989) (summarizing the evidence on each side of the case).

The six bullets and the revolver were the only physical evidence. Besides those items, the police found no evidence at the crime scenes that could be used to identify the perpetrator (such as fingerprints) and no incriminating evidence at Hinton's home or in his car. The State's case turned on whether its expert witnesses could convince the jury that the six recovered bullets had indeed been fired from the Hinton revolver. According to the Alabama Supreme Court, "the only evidence linking Hin-

ton to the two murders were forensic comparisons of the bullets recovered from those crime scenes to the Hinton revolver." 2008 WL 4603723, *2 (Oct. 17, 2008).

The category of forensic evidence at issue in this case is "firearms and toolmark" evidence. Toolmark examiners attempt to determine whether a bullet recovered from a crime scene was fired from a particular gun by comparing microscopic markings (toolmarks) on the recovered bullet to the markings on a bullet known to have been fired from that gun. The theory is that minor differences even between guns of the same model will leave discernible traces on bullets that are unique enough for an examiner to conclude that the recovered bullet was or was not fired from a given weapon. See generally National Research Council, Strengthening Forensic Science in the United States: A Path Forward 150–155 (2009).

Recognizing that Hinton's defense called for an effective rebuttal of the State's expert witnesses, Hinton's attorney filed a motion for funding to hire an expert witness of his own. In response, the trial judge granted $1,000 with this statement:

> "'I don't know as to what my limitations are as for how much I can grant, but I can grant up to $500.00 in each case [that is, for each of the two murder charges, which were tried together] as far as I know right now and I'm granting up to $500.00 in each of these two cases for this. So if you need additional experts I would go ahead and file on a separate form and I'll have to see if I can grant additional experts, but I am granting up to $500.00, which is the statutory maximum as far as I know on this and if it's necessary that we go beyond that then I may check to see if we can, but this one's granted.'" 2006 WL 1125605, *59 (Ala. Crim. App., Apr. 28, 2006) (Cobb, J., dissenting) (quoting Tr. 10).

Hinton's attorney did not take the judge up on his invitation to file a request for more funding.

In fact, $500 per case ($1,000 total) was *not* the statutory maximum at the time of Hinton's trial. An earlier version of the statute had limited state reimbursement of expenses to one half of the $1,000 statutory cap on attorney's fees, which explains why the judge believed that Hinton was entitled to up to $500 for each of the two murder charges. See *Smelley* v. *State*, 564 So. 2d 74, 88 (Ala. Crim. App. 1990). But the relevant statute had been amended to provide: "'Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court.'" See *Dubose* v. *State*, 662 So. 2d 1156, 1177, n. 5 (Ala. Crim. App. 1993) (quoting Ala. Code §15–12–21(d) (1984)), aff'd 662 So. 2d 1189 (Ala. 1995). That amendment went into effect on June 13, 1984, *Dubose, supra,* at 1177, n. 5, which was over a year before Hinton was arrested, so Hinton's trial attorney could have corrected the trial judge's mistaken belief that a $1,000 limit applied and accepted his invitation to file a motion for additional funds.

The attorney failed to do so because he was himself unaware that Alabama law no longer imposed a specific limit and instead allowed reimbursement for "any expenses reasonably incurred." At an evidentiary hearing held on Hinton's postconviction petition, the following conversation occurred between a state attorney and Hinton's trial attorney:

> "Q. You did an awful lot of work to try and find what you believed to be a qualified expert in this case, didn't you?
> "A. Yes, sir, I did.
> "Q. Would you characterize it that you did everything that you knew to do?

"A.  Yes, sir, I think so.

"Q.  And this case, did it come down to an unwilling-ness of experts to work for the price that you were able to pay?

"A.  Yes, sir, I think it did.

"Q.  So your failure to get an expert that you would have been let's say a hundred percent satisfied with was not a failure on your part to go out and do some act, it was a failure of the court to approve what you believed would have been sufficient funds?

"A.  Well, putting it a little differently, yes, sir, it was a failure—*it was my failure, my inability under the statute to obtain any more funding for the purpose of hiring qualified experts.*"  Reporter's Official Tr. 206–207 (emphasis added).

Operating under the mistaken belief that he could pay no more than $1,000, Hinton's attorney went looking for an expert witness.  According to his postconviction testi-mony, he made an extensive search for a well-regarded expert, but found only one person who was willing to take the case for the pay he could offer: Andrew Payne.  Hin-ton's attorney "testified that Payne did not have the exper-tise he thought he needed and that he did not consider Payne's testimony to be effective."  2006 WL 1125605, *27.  As he told the trial judge during a pretrial hearing:

"I made an effort to get somebody that I thought would be useable.  And I'll have to tell you what I did [about] Payne.  I called a couple of other lawyers in town . . . to ask if they knew of anybody.  One of them knew him; one of them knew him.  The reason I didn't contact him was because he wasn't recommended by the lawyer.  So now I'm stuck that he's the only guy I could possibly produce."  *Id.,* at *30 (internal quota-tion marks omitted).

At trial, Payne testified that the toolmarks in the barrel

of the Hinton revolver had been corroded away so that it would be impossible to say with certainty whether a particular bullet had been fired from that gun. He also testified that the bullets from the three crime scenes did not match one another. The State's two experts, by contrast, maintained that all six bullets had indeed been fired from the Hinton revolver.

On cross-examination, the prosecutor badly discredited Payne. Payne admitted that he'd testified as an expert on firearms and toolmark identification just twice in the preceding eight years and that one of the two cases involved a shotgun rather than a handgun. Payne also conceded that he had had difficulty operating the microscope at the state forensic laboratory and had asked for help from one of the state experts. The prosecutor ended the cross-examination with this colloquy:

> "Q. Mr. Payne, do you have some problem with your vision?
> "A. Why, yes.
> "Q. How many eyes do you have?
> "A. One." Tr. 1667.

The prosecutor's closing argument highlighted the fact that Payne's expertise was in military ordnance, not firearms and toolmark identification, and that Payne had graduated in 1933 (more than half a century before the trial) with a degree in civil engineering, whereas the State's experts had years of training and experience in the field of firearms and toolmark examination. The prosecutor said:

> "'I ask you to reject [Payne's] testimony and you have that option because you are the judges of the facts and whose testimony, Mr. Yates' or Mr. Payne's, you will give credence to, and I submit to you that as between these two men there is no match between them. There is no comparison. One man just doesn't have it

and the other does it day in and day out, month in and month out, year in and year out, and is recognized across the state as an expert.'"  2006 WL 1125605, *64 (Cobb, J., dissenting) (quoting Tr. 1733–1734).

The jury convicted Hinton and recommended by a 10-to-2 vote that he be sentenced to death.  The trial judge accepted that recommendation and imposed a death sentence.

### B

In his state postconviction petition, Hinton contended that his trial attorney was "'ineffective to not seek additional funds when it became obvious that the individual willing to examine the evidence in the case for the $1,000 allotted by the court was incompetent and unqualified. Indeed, this failure to seek additional, sufficient funds is rendered all the more inexplicable by the trial court's express invitation to counsel to seek more funds if such funds were necessary.'"  2006 WL 1125605, *28.

To show that he had been prejudiced by Payne's ineffective testimony, Hinton produced three new experts on toolmark evidence.  One of the three, a forensic consultant named John Dillon, had worked on toolmark identification at the Federal Bureau of Investigation's forensics laboratory and, from 1988 until he retired in 1994, had served as chief of the firearms and toolmark unit at the FBI's headquarters.  The other two postconviction experts had worked for many years as firearms and toolmark examiners at the Dallas County Crime Laboratory and had each testified as toolmark experts in several hundred cases.

All three experts examined the physical evidence and testified that they could not conclude that any of the six bullets had been fired from the Hinton revolver.  The State did not submit rebuttal evidence during the postconviction hearing, and one of Hinton's experts testified that, pursuant to the ethics code of his trade organization, the Associ-

ation of Firearm and Tool Mark Examiners, he had asked the State's expert, Yates, to show him how he had determined that the recovered bullets had been fired from the Hinton revolver. Yates refused to cooperate.

## C

The circuit court denied Hinton's postconviction petition on the ground that Hinton had not been prejudiced by Payne's allegedly poor performance because Payne's testimony did not depart from what Hinton's postconviction experts had said: The bullets could not be affirmatively matched either to one another or to the Hinton revolver.

The Alabama Court of Criminal Appeals affirmed by a 3-to-2 vote. 2006 WL 1125605. The court agreed with the circuit court that Hinton had not been prejudiced because Payne's testimony, if believed by the jury, strongly supported the inference that Hinton was innocent. *Id.,* at *31. Then-Judge Cobb (who later became chief justice of the Alabama Supreme Court) dissented. In her view, Hinton's attorney had been ineffective in failing to seek additional funds to hire a better expert and Hinton had been prejudiced by that failure, meaning that he was entitled to a new trial. Then-Judge Shaw (who is now a justice of the Alabama Supreme Court) also dissented. He would have remanded the case to the circuit court to make a finding as to whether or not Payne was qualified to act as an expert on toolmark evidence. He stated that "[i]t goes without saying that, with knowledge that sufficient funds were available to have a qualified firearms and toolmarks expert, no reasonable criminal defense lawyer would seek out and hire an unqualified firearms witness." *Id.,* at *73.

The Supreme Court of Alabama reversed and remanded. 2008 WL 4603723. After quoting at length from Judge Shaw's dissent, the Court stated, "We agree with Judge Shaw that 'the dispositive issue is whether Payne was a qualified firearms and toolmarks expert' and that in deny-

ing Hinton's [postconviction] petition the trial court did not directly rule on 'the issue whether Payne was qualified to be testifying in the first place.'" *Id.,* at *4 (quoting 2006 WL 1125605, *70, *72 (Shaw, J., dissenting)). The Supreme Court was thus focused on Payne's own qualifications, rather than on whether a better expert—one who could have been hired had the attorney learned that there was no funding cap and requested additional funds— would have made a more compelling case for Hinton.

On remand, the circuit court held that Payne was indeed qualified to testify as a firearms and toolmark expert witness under the Alabama evidentiary standard in place at the time of the trial, which required only that Payne have had "knowledge of firearms and toolmarks examination beyond that of an average layperson." 2008 WL 5517591, *5 (Ala. Crim. App., Dec. 19, 2008); see also *Charles* v. *State*, 350 So. 2d 730, 733 (Ala. Crim. App. 1977) ("An 'expert witness' is one who can enlighten a jury more than the average man in the street. . . . An expert witness, by definition, is any person whose opportunity or means of knowledge in a specialized art or science is to some degree better than that found in the average juror or witness"). The appellate court affirmed the circuit court's ruling that Payne was qualified under the applicable standard. 2013 WL 598122 (Ala. Crim. App., Feb. 15, 2013). The Alabama Supreme Court denied review by a 4-to-3 vote, with two justices recused. Hinton then filed this petition for a writ of certiorari.

## II

This case calls for a straightforward application of our ineffective-assistance-of-counsel precedents, beginning with *Strickland* v. *Washington*, 466 U. S. 668. *Strickland* recognized that the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence"

entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence. *Id.,* at 685–687. "Under *Strickland,* we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Padilla* v. *Kentucky,* 559 U. S. 356, 366 (2010) (quoting *Strickland, supra,* at 688, 694).

## A

"The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla, supra,* at 366 (quoting *Strickland, supra,* at 688). "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland, supra,* at 688. Under that standard, it was unreasonable for Hinton's lawyer to fail to seek additional funds to hire an expert where that failure was based not on any strategic choice but on a mistaken belief that available funding was capped at $1,000.

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Harrington* v. *Richter,* 562 U. S. ___, ___ (2011) (slip op., at 16). This was such a case. As Hinton's trial attorney recognized, the core of the prosecution's case was the state experts' conclusion that the six bullets had been fired from the Hinton revolver, and effectively rebutting that case required a competent expert on the defense side. Hinton's attorney also recognized that Payne was not a good expert, at least with respect to toolmark evidence. Nonetheless,

he felt he was "stuck" with Payne because he could not find a better expert willing to work for $1,000 and he believed that he was unable to obtain more than $1,000 to cover expert fees.

As discussed above, that belief was wrong: Alabama law in effect beginning more than a year before Hinton was arrested provided for state reimbursement of "any expenses reasonably incurred in such defense to be approved in advance by the trial court." Ala. Code §15–12–21(d). And the trial judge expressly invited Hinton's attorney to file a request for further funds if he felt that more funding was necessary. Yet the attorney did not seek further funding.

The trial attorney's failure to request additional funding in order to replace an expert he knew to be inadequate because he mistakenly believed that he had received all he could get under Alabama law constituted deficient performance. Under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U. S., at 690–691. Hinton's attorney knew that he needed more funding to present an effective defense, yet he failed to make even the cursory investigation of the state statute providing for defense funding for indigent defendants that would have revealed to him that he could receive reimbursement not just for $1,000 but for "any expenses reasonably incurred." An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*. See, *e.g., Williams* v. *Taylor*, 529 U. S. 362,

395 (2000) (finding deficient performance where counsel "failed to conduct an investigation that would have uncovered extensive records [that could be used for death penalty mitigation purposes], not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Kimmelman* v. *Morrison*, 477 U. S. 365, 385 (1986) (finding deficient performance where counsel failed to conduct pretrial discovery and that failure "was not based on 'strategy,' but on counsel's mistaken belie[f] that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").

We wish to be clear that the inadequate assistance of counsel we find in this case does not consist of the hiring of an expert who, though qualified, was not qualified enough. The selection of an expert witness is a paradigmatic example of the type of "strategic choic[e]" that, when made "after thorough investigation of [the] law and facts," is "virtually unchallengeable." *Strickland*, 466 U. S., at 690. We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired. The only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that *he himself* deemed inadequate.

B

Having established deficient performance, Hinton must also "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would

have had a reasonable doubt respecting guilt." *Id.,* at 695.

The Court of Criminal Appeals held, and the State contends in its brief in opposition to certiorari, that Hinton could not have been prejudiced by his attorney's use of Payne rather than a more qualified expert because Payne said all that Hinton could have hoped for from a toolmark expert: that the bullets used in the crimes could not have been fired from the Hinton revolver. See 2006 WL 1125605, *31 ("[E]ven assuming that counsel's apparent ignorance that the cap on expert expenses had been lifted constituted deficient performance . . . , the appellant has not shown that he was prejudiced by that deficient performance"). It is true that Payne's testimony would have done Hinton a lot of good *if the jury had believed it.* But the jury did not believe Payne. And if there is a reasonable probability that Hinton's attorney would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt had the attorney known that the statutory funding limit had been lifted, then Hinton was prejudiced by his lawyer's deficient performance and is entitled to a new trial.

That the State presented testimony from two experienced expert witnesses that tended to inculpate Hinton does not, taken alone, demonstrate that Hinton is guilty. Prosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials. . . . One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases." *Melendez-Diaz* v. *Massachusetts,* 557 U. S. 305, 319 (2009) (citing Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L. Rev. 1, 14

(2009)). This threat is minimized when the defense re-
tains a competent expert to counter the testimony of the
prosecution's expert witnesses; it is maximized when the
defense instead fails to understand the resources available
to it by law.

Because no court has yet evaluated the prejudice ques-
tion by applying the proper inquiry to the facts of this
case, we remand the case for reconsideration of whether
Hinton's attorney's deficient performance was prejudicial
under *Strickland*.

*       *       *

The petition for certiorari and Hinton's motion for leave
to proceed *in forma pauperis* are granted, the judgment of
the Court of Criminal Appeals of Alabama is vacated, and
the case is remanded for further proceedings not incon-
sistent with this opinion.

*It is so ordered.*