[Cite as *State v. Billiter*, 2025-Ohio-4693.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :    Case No.  24CA4095

    v.                            :

JAROD BILLITER,                   :    DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.         :

_____

APPEARANCES:

Brian T. Goldberg, Cincinnati, Ohio, for appellant.[1]

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay
Willis, Scioto County Assistant Prosecuting Attorney, Portsmouth,
Ohio, for appellee.

_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:10-6-25
ABELE, J.

    **{¶1}**  This is an appeal from a Scioto County Common Pleas
Court judgment of conviction and sentence.  Jarod Billiter,
defendant below and appellant herein, assigns the following
errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED TO THE PREJUDICE OF
> MR. BILLITER'S SIXTH AMENDMENT RIGHTS BY
> ENTERING JUDGMENT OF CONVICTION AFTER A

_____

[1]   Different counsel represented appellant during the trial court
proceedings.

TRIAL AT WHICH HE RECEIVED INEFFECTIVE
ASSISTANCE OF COUNSEL FOR HIS DEFENSE."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT VIOLATED MR. BILLITER'S
CONSTITUTIONAL RIGHT TO SELF-REPRESENTATION
BY DENYING HIS REQUEST TO TERMINATE COUNSEL
AND PROCEED PRO SE."

THIRD ASSIGNMENT OF ERROR:

"MR. BILLITER'S CONVICTIONS WERE NOT
SUPPORTED BY SUFFICIENT EVIDENCE AND ARE
CONTRARY TO THE MANIFEST WEIGHT OF THE
EVIDENCE."

**{¶2}** On November 4, 2021, two members of the Southern Ohio Drug Task Force, Portsmouth Police Detective Kevin Metzler and Scioto County Sheriff's Detective Jay Springs, engaged husband-and-wife informants, James and Tonyia Elliott, to make a controlled purchase of illegal drugs from appellant.

**{¶3}** Mrs. Elliott initiated contact with appellant via a recorded telephone call. Mrs. Elliott told appellant that she "need[ed] two." Appellant asked her if she wanted them in "the same bag," and she responded affirmatively. Appellant advised Mrs. Elliott to come to "the shop," which Mrs. Elliott knew meant appellant's store, Truthseekers. Appellant cautioned that, if any customers were present when she arrived, then she should either not enter the store, or, if she did, she should act like she was shopping. Appellant stated that he "wouldn't be able to do this until they [i.e., any customers] were gone."

{¶4} Before the Elliotts drove to the store, the task force officers outfitted them with covert audio- and video-recording devices and gave them money to purchase the drugs. When the couple arrived at appellant's store, a customer was present, so they walked around the store until the customer left. As soon as the customer left, the Elliotts approached the counter, and appellant entered a back room. A few moments later, appellant emerged with a small plastic bag, handed the bag to Mrs. Elliott, and Mrs. Elliott gave appellant money. Appellant placed the money in his pocket.

{¶5} Afterward, the Elliotts rendezvoused with the detectives and gave them the plastic bag. Testing later revealed that the plastic bag contained 1.96 grams of a fentanyl mixture.

{¶6} A Scioto County Grand Jury subsequently returned an indictment that charged appellant with (1) trafficking in a fentanyl-related compound, in violation of R.C. 2925.03(A)(1), a fourth-degree felony, (2) possession of a fentanyl-related compound, in violation of R.C. 2925.11(A), a fifth-degree felony, and (3) possession of criminal tools, in violation of R.C. 2923.24(A), a fifth-degree felony. Appellant entered not-guilty pleas.

{¶7} At trial, the State presented four witnesses:

Detective Metzler, Mr. Elliott, Mrs. Elliott, and Detective Springs. Detective Metzler testified that in early November 2021, task force officers executed a search warrant at the Elliotts' residence. During the search, officers discovered "a small amount of fentanyl" and "other items associated with the distribution of drugs." After interviewing the Elliotts, the task force turned its investigation to appellant.

{¶8} Officers arranged for the Elliotts to make a controlled buy from appellant. Mrs. Elliott called appellant's phone number to plan the purchase and, during the phone call, stated, "I need two." Appellant told Mrs. Elliott that he was at his store and that she could come to the store.

{¶9} Detective Metzler explained that Mrs. Elliott's statement that she needed "two" indicated that she "already had involvement with [appellant], and when she's asking just for two, he already knows what she's talking about." Detective Metzler stated that, based upon his experience, "two" meant two grams.

{¶10} During Detective Metzler's testimony, the State played two video recordings of the controlled buy: one from Mrs. Elliott's perspective, and one from Mr. Elliott's perspective. Detective Metzler explained that, when the Elliotts arrived at appellant's store, a customer was present. After the customer left, appellant entered a back room. When he emerged, he handed

a bag of drugs to Mrs. Elliott, and Mrs. Elliott handed appellant the money. Appellant then placed the money in his pocket. Detective Metzler stated that the video recording showed appellant selling fentanyl.

{¶11} After the Elliotts completed the purchase, they reconnected with Detectives Metzler and Springs and gave them the plastic bag that they had obtained from appellant. The detectives performed a field test, and the substance tested positive for cocaine. Detective Metzler explained that other officers have been seeing similar field tests returning as presumptive positive for cocaine, even though lab tests later confirmed the substances as fentanyl mixtures. The detective ultimately sent the plastic bag to the Bureau of Criminal Investigation (BCI) for further testing.

{¶12} In July 2022, Detective Metzler received the results from BCI. The report stated that the plastic bag contained 1.96 grams of a fentanyl mixture.

{¶13} On cross-examination, Detective Metzler indicated that the first video that the State played showed the transaction from Mrs. Elliott's perspective, and he agreed that Mrs. Elliott's video camera did not capture the hand-to-hand transaction. He further agreed that, when Mrs. Elliott called appellant to inquire about buying "two," she did not specifically name a drug. The detective explained, however,

that "when informants are typically reaching out to their source of supply they try . . . to keep communications minimal." He stated that if the informant had previous contact with the supplier, then the supplier will know what the informant means by "two," as in "two grams of fentanyl or heroin or whatever their drug of choice is."

{¶14} Appellant's counsel asked Detective Metzler whether officers seized the money that Mrs. Elliott had used to purchase the drugs. The detective explained that officers did not seize any money because they did not obtain a search warrant for appellant's property. He stated that the officers "lost connection with [appellant]." Detective Metzler was aware, however, that appellant continued to operate his store.

{¶15} Appellant's counsel asked the detective if he knew why a drug would "test positive for something else in the field and a different type of drug in the lab[.]" Detective Metzler explained that "[i]t could be many things," but he was unable to state why some "analogs of fentanyl or opiates that are fentanyl are testing positive for . . . cocaine." He agreed that the lab test indicated that the substance contained "three different kinds of fentanyl."

{¶16} On re-direct, Detective Metzler explained that, if an informant calls a supplier and asks for "two grams of heroin," it may jeopardize the informant's ability to complete a

purchase.  The detective also noted that, when Mrs. Elliott stated that she needed "two," appellant did not ask her what she meant.  Instead, he asked her if she wanted "them in the same bag."

{¶17} The prosecutor next asked Detective Metzler to explain why, after the Elliotts had completed the controlled purchase, officers did not seek a warrant to search appellant's property. The detective stated that officers typically do not seek a search warrant based upon a single, controlled buy.  Instead, officers generally prefer "to conduct multiple control video recorded purchases just to obtain more information prior to that search warrant to get any information that we didn't have."

{¶18} The prosecutor additionally asked Detective Metzler whether the field test or the lab test is more accurate.  The detective replied that the lab test is "more accurate."

{¶19} The State next called Mr. Elliott to testify, and he testified that he and Mrs. Elliott do not use drugs, but purchased them on behalf of other individuals.  Appellant was his supplier.

{¶20} After officers discovered drugs inside the Elliotts' residence, he and Mrs. Elliott were criminally prosecuted.  Mr. Elliott entered a guilty plea to fourth-degree-felony drug trafficking and was placed on community control.  As part of his

plea agreement, he agreed to assist the drug task force.

{¶21} On the date of the controlled buy from appellant, Mrs. Elliott called appellant and asked for "two." Mr. Elliott understood Mrs. Elliott's request for "two" to be a request for two grams of fentanyl.

{¶22} After Mrs. Elliott spoke with appellant, they drove to appellant's store. Because a customer was inside the store, before they approached appellant to complete the drug transaction the Elliotts waited for the customer to depart.

{¶23} After the customer left, Mrs. Elliott went to the counter, and appellant prepared the drugs. Mrs. Elliott handed appellant money, and appellant gave Mrs. Elliott the plastic bag that contained the drugs. Appellant placed the money in his pocket. The Elliotts then left the store, met with Detective Springs, and gave him the plastic bag that they had obtained from appellant.

{¶24} On cross-examination, Mr. Elliott stated that he has known appellant for 10 to 12 years. Since November 4, 2021, the date of the controlled drug buy, he has spoken to appellant a few times. He believed that they last spoke in June 2023. Appellant's counsel did not ask Mr. Elliott any other questions.

{¶25} Mrs. Elliott, the State's next witness, testified that she and appellant were high-school classmates, and they have had a "friendship" for around 20 years. Mrs. Elliott did not use

drugs, but she purchased drugs from appellant on behalf of other individuals.

{¶26} After officers searched her house and discovered drugs, she agreed to cooperate with officers. Mrs. Elliott later entered a guilty plea to drug trafficking and was placed on community control.

{¶27} On the date of the controlled buy, the Elliotts met with members of the drug task force. The officers outfitted them with covert recording devices and gave them money to purchase the drugs. Mrs. Elliott called appellant to arrange the transaction. She told him that she needed "two." Mrs. Elliott explained that appellant knew what she meant because he is "a drug dealer," and they had a pre-existing relationship. Appellant told Mrs. Elliott that he was at his store and that she could come to the store. He further advised Mrs. Elliott that, if a customer was inside the store, she should "look around like [she] was shopping."

{¶28} When the Elliotts arrived at appellant's store a customer was present, so they acted like they were shopping. After the customer left, appellant handed Mrs. Elliott two grams of fentanyl. Mrs. Elliott recognized the drug as fentanyl based on her previous experience. During the transaction, appellant mentioned an ongoing custody issue involving his son. After she

and Mr. Elliott left the store, they reconnected with the task force officers and gave them the plastic bag.

{¶29} On cross-examination, appellant's counsel questioned Mrs. Elliott about the length of time that she has known appellant and whether they have been "friends." Mrs. Elliott stated that they were "acquaintances," and, after the controlled buy, they remained "acquaintances." She did not recall the last time that she had contact with appellant.

{¶30} Appellant's counsel further asked Mrs. Elliott whether she was aware that appellant had a pending custody case. Mrs. Elliott stated that she was aware and had been planning to testify on appellant's behalf.

{¶31} The State next called Detective Springs who testified that the Elliotts agreed to act as informants. He listened to the phone call between Mrs. Elliott and appellant and stated that it indicated "a drug deal." Detective Springs explained that drug buyers and suppliers are intentionally ambiguous with the language they use when talking about drugs, so he did not find Mrs. Elliott's statement to appellant that she needed "two" to be unusual.

{¶32} When the Elliotts arrived at appellant's store, they did exactly as appellant instructed them to do if a customer was present: They acted as if they were shopping. Immediately after the customer left, "[i]t [went] straight to business, [a]

transaction for dope."

{¶33} Detective Springs monitored the transaction via audio and video. The audio recorded a "banging sound." This sound suggested that appellant had a larger amount of the drug and needed to break it apart. Detective Springs stated, "when we hear that, it's . . . a good . . . thing to hear, cause you think, okay, there's a lot there. . . ."

{¶34} Shortly after the banging sound ended, appellant appeared with a small plastic bag in his hand, ensured that it was closed, and handed it to Mrs. Elliott. Mrs. Elliott gave appellant the money, and he placed it in his pocket.

{¶35} When the Elliotts left appellant's store, they drove to the location where Detectives Metzler and Springs were waiting. The Elliotts gave the plastic bag to the detectives. The detectives immediately placed the drugs into an evidence bag.

{¶36} Detective Springs indicated that, after the date of the controlled buy, officers continued to investigate appellant but could not engage a new informant.

{¶37} On cross-examination, Detective Springs agreed that appellant was not arrested on the date of the controlled buy, November 4, 2021. On that date, the detective completed a standard form titled, "arrest report." Detective Springs explained that this form reports "exactly what took place for

that day." He further indicated that, despite the name of the report, appellant was not arrested.

**{¶38}** After Detective Springs testified, the court excused the jurors, admitted the State's exhibits into evidence and the State rested.

**{¶39}** When the jury returned to the courtroom, the State formally rested, and appellant's counsel indicated that appellant did not intend to offer evidence. At that point, appellant interjected that he "would like to motion for ineffective . . . assistance of counsel." The court then excused the jury and then allowed appellant to elaborate.

**{¶40}** Appellant repeated his assertion that counsel had been ineffective and further stated that he wanted to present closing argument on his own behalf. Appellant also asserted that the State committed "a *Brady* violation."[2] Appellant claimed that Detective Springs had submitted a fraudulent arrest report that indicated that, on November 4, 2021, appellant had been arrested for trafficking in heroin. The trial court pointed out that appellant's counsel asked the detective about the arrest report, and the detective explained it.

**{¶41}** Appellant also complained that the detectives' field

---

2       The rule set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), requires the prosecution "to disclose evidence that is favorable to the accused and material to the accused's guilt or punishment." *State v. McNeal*, 2022-Ohio-2703, ¶ 19, citing *Brady* at 87.

testing indicated that the drug was cocaine, but "then seven months later [it] transforms into another drug and the only opinions that we got were from the detectives on that matter when they are not experts in if a drug can magically transform from one substance to another."  The trial court, however, did not find any evidence of a *Brady* violation.

{¶42} The trial court next asked appellant to elaborate on his complaint regarding ineffective assistance of counsel. Appellant stated that he "had no communication with my Counsel, rarely, about any evidence in this case until one day before jury trial."  Appellant also stated that he asked trial counsel "multiple times to present evidence and she refused."  Appellant claimed that he had "[e]vidence that proves what [he] was doing that day—the day in question," along with "the day after [the day in] question."  He further suggested that he had evidence that "directly ties the confidential informant's [sic] witnesses to my custody case."

{¶43} Appellant additionally complained that trial counsel "did not effectively cross examine video evidence that the Prosecution left out."  He pointed out that portions of the undercover video recordings showed "the sky" and did not show what the informants were doing.

{¶44} Appellant next asserted that his counsel "ineffectively questioned Detective Springs about an

investigation on [appellant] when [he] was never questioned by any police, searched, anything." He also criticized counsel because she did not "ask any questions that [he] asked her to ask" and did not present any evidence on his behalf.

{¶45} Trial counsel, however, disputed appellant's claim that she had not communicated with appellant until the day before trial. She also stated that she could not submit the evidence that appellant wanted her to submit because she did not have a witness to introduce the evidence. Trial counsel further indicated that she did not identify any witnesses who would help appellant's defense. She agreed that appellant has some time-stamped social-media posts that showed that he was not arrested on November 4, 2021. Counsel believed that she had elicited that same information during her cross-examination of Detective Springs.

{¶46} The trial court next turned to appellant's request that he be allowed to present his closing argument pro se. The State asserted that appellant's request was untimely. The court agreed that appellant's request was untimely and denied it on that basis. The court also found that allowing appellant to present closing argument pro se would "only serve to confuse the jury, and serve potentially to offer argument, not evidence that was not offered to the jury."

{¶47} The trial court asked appellant whether he wished to

say anything else before the jury returned to the courtroom. Appellant stated that "this is just crazy" and that he did not understand why he could not defend himself.  He proclaimed that he was involved "in a custody battle right now" and was "being framed for a charge."  The court responded, "All right," and asked that the jury be returned to the courtroom.

{¶48} During closing argument, appellant's counsel pointed out that officers never arrested appellant, seized money from him, or searched his home or business.  Trial counsel observed that appellant continued to operate his business, and the Elliotts maintained some contact with appellant, despite the officers' claims that they lost contact with appellant.  Trial counsel ended her closing argument by inviting the jury to question the credibility of the Elliotts' testimony due to the criminal charges that led them to agree to cooperate with the drug task force.

{¶49} The jury subsequently found appellant guilty of all three counts as charged in the indictment.

{¶50} On July 15, 2024, the trial court sentenced appellant. Before it announced appellant's sentence, the court merged the trafficking and possession offenses, and the State elected to proceed to sentencing on the trafficking offense.  The court then ordered appellant to serve an 18-month prison term for the trafficking offense and a 12-month prison term for the

possession-of-criminal-tools offense, with the sentences to be served consecutively to one another, for a total aggregate prison term of 30 months.  This appeal followed.[3]

I

{¶51} In his first assignment of error, appellant asserts that he did not receive the effective assistance of counsel. Appellant contends that trial counsel was ineffective for (1) failing to "effectively cross-examine witnesses for the State" and (2) making "a bare bone closing argument."

A

{¶52} The Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense.  The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (the Sixth Amendment right to counsel means "that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence").

---

[3]    On September 9, 2024, appellant filed a notice of appeal and a motion for leave to file a delayed appeal.  On October 21, 2024, this court granted appellant's motion.

{¶53} To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) trial counsel's performance was deficient and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *E.g., Strickland*, 466 U.S. at 687; *State v. Myers*, 2018-Ohio-1903, ¶ 183; *State v. Powell*, 2012-Ohio-2577, ¶ 85. "Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000) (a defendant's failure to satisfy one of the ineffective-assistance-of-counsel elements "negates a court's need to consider the other").

{¶54} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting *Strickland*, 466 U.S. at 688; *accord Hinton*, 571 U.S. at 273. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." (Citations omitted.) *State v. Conway*, 2006-Ohio-2815, ¶ 95. Furthermore, "'[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's

assistance was reasonable considering all the circumstances.'"
*Hinton*, 571 U.S. at 273, quoting *Strickland*, 466 U.S. at 688.

{¶55} Moreover, when considering whether trial counsel's
representation amounts to deficient performance, "a court must
indulge a strong presumption that counsel's conduct falls within
the wide range of reasonable professional assistance[.]"
*Strickland*, 466 U.S. at 689.  Thus, "the defendant must overcome
the presumption that, under the circumstances, the challenged
action might be considered sound trial strategy."  *Id.*
Additionally, "[a] properly licensed attorney is presumed to
execute his duties in an ethical and competent manner."  *State
v. Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v.
Smith*, 17 Ohio St.3d 98, 100 (1985).  Therefore, a defendant
bears the burden to show ineffectiveness by demonstrating that
counsel's errors were "so serious" that counsel failed to
function "as the 'counsel' guaranteed . . . by the Sixth
Amendment."  *Strickland*, 466 U.S. at 687; *e.g., State v. Gondor*,
2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156
(1988).

{¶56} To establish prejudice, a defendant must demonstrate
"'a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome.'"  *Hinton*,

571 U.S. at 275, quoting *Strickland*, 466 U.S. at 694; *e.g.,* *State v. Short*, 2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 2016-Ohio-8126, ¶ 91 (prejudice component requires a "but for" analysis).  "'[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'"  *Hinton*, 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 695.

{¶57} Furthermore, courts ordinarily may not simply presume the existence of prejudice but, instead, must require a defendant to affirmatively establish prejudice.  *E.g.*, *State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.); *State v. Tucker*, 2002 WL 507529 (4th Dist. Apr. 2, 2002).  Additionally, we have repeatedly recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim.  *E.g., State v. Tabor*, 2017-Ohio-8656, ¶ 34 (4th Dist.); *State v. Leonard*, 2009-Ohio-6191, ¶ 68 (4th Dist.); *accord State v. Powell*, 2012-Ohio-2577, ¶ 86 (a purely speculative argument cannot serve as the basis for an ineffectiveness claim).

B

{¶58} Appellant first claims that trial counsel performed ineffectively for her failure to thoroughly cross-examine the two informants, Mr. and Mrs. Elliott.  Appellant argues that the

two informants "had significant credibility issues" that trial counsel did not explore. He states that both informants "admitted they had engaged in [the] alleged undercover drug sale to get a sentencing reduction on their own cases." Appellant contends that trial counsel should have asked the informants how much prison time they faced for the offenses. Appellant asserts that "[i]f the jury was told [the informants] received a significant reduction in their charges, [the jury] may have questioned the reliability of their testimony."

{¶59} Appellant additionally argues that trial counsel was ineffective for failing "to investigate a bias between one of the State's main witnesses and [appellant]." Appellant further states that, during trial, he "claimed to have evidence that one of the informants was directly tied to his custody case." Appellant contends that, although the record does not indicate what information appellant possessed, trial counsel should have inquired.

{¶60} In general, "'[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel.'" *State v. Spaulding*, 2016-Ohio-8126, ¶ 90, quoting *Conway*, 2006-Ohio-2815, at ¶ 101. Furthermore, a defendant alleging that trial counsel performed deficiently during cross-examination "must identify the questions that [the defendant] believes [defense] counsel

should have asked and must provide some sense of the information that might have been elicited." *State v. Beasley*, 2018-Ohio-493, ¶ 15, citing *State v. Frazier*, 2007-Ohio-5048, ¶ 220. Otherwise, courts will presume that counsel's choice to forgo additional cross-examination constituted a legitimate tactical decision. *See State v. Foust*, 2004-Ohio-7006, ¶ 90 (counsel made a legitimate tactical decision to forgo additional cross-examination, and the defendant "fail[ed] to explain how further cross-examination of [the witness] would have made a difference in his case"); *State v. Hanna*, 2002-Ohio-2221, ¶ 123 (counsel's choice to forgo further cross-examination was a legitimate tactical decision made "to avoid the danger of reinforcing the state's evidence . . . and clarifying expert testimony that might not come out in [the defendant]'s favor . . . ."); *see also Beasley* at ¶ 15; *Frazier* at ¶ 220.

**{¶61}** In the case at bar, trial counsel's decision to forgo additional cross-examination of the two informants appears to be a legitimate tactical decision intended to avoid highlighting the strength of the State's audio and video evidence. If counsel had asked the informants questions about their plea agreements to attempt to bring the reliability of their testimonies into question, then the prosecutor may have sought, on redirect, to again point out that the audio and video recordings strongly corroborated their testimonies.

{¶62} Additionally, because the audio and video recordings corroborated the informants' testimonies, trial counsel reasonably could have decided that attacking the reliability of their testimonies would have been unsuccessful.  Appellant, therefore, cannot establish that trial counsel performed deficiently by failing to question the credibility of the informants' testimonies.

{¶63} Moreover, even if trial counsel's cross-examination of the two informants was deficient, appellant cannot establish a reasonable probability that the outcome of the trial would have been different, if trial counsel had asked the informants questions regarding the penalties that the informants faced in the absence of their plea agreements.  As we noted above, the audio and video recordings corroborated the informants' testimonies.  Thus, the jury likely would not have been swayed to discredit the informants' testimonies if trial counsel had inquired into the penalties that the informants faced in the absence of their plea agreements.  Furthermore, attacking the informants' credibility would not have undermined the evidentiary strength of the audio and video recordings.  We therefore do not agree with appellant's argument that trial counsel was ineffective for failing to attack the credibility of the informants' testimonies.

{¶64} Appellant also argues that trial counsel should have

asked questions (1) to investigate a bias between one of the informants and appellant, and (2) to uncover whether "one of the informants was directly tied to his custody case." These arguments are speculative. *See Frazier*, 2007-Ohio-5048, at ¶ 220 ("whether further questioning would have unearthed any useful information is speculative"). Speculation is insufficient to establish an ineffective-assistance claim. *E.g.*, *State v. Guysinger*, 2017-Ohio-1167, ¶ 31 (4th Dist.), citing *Short*, 2011-Ohio-3641, at ¶ 119 (mere speculation cannot support either the deficient-performance or prejudice requirements of an ineffective-assistance claim). Appellant thus cannot establish that trial counsel performed deficiently by failing to cross-examine the informants regarding these issues or that any deficient performance resulted in prejudice.

**{¶65}** Additionally, appellant's arguments appear to rely upon evidence that is not contained in the record. To the extent that appellant's ineffectiveness claim relies upon evidence that is not contained in the record, we may not consider it on direct appeal. *See State v. Goff*, 2018-Ohio-3763, ¶ 44 (relying on evidence outside the record is not appropriate on a direct appeal); *State v. Hartman*, 93 Ohio St.3d 274, 299 (2001) (if establishing ineffective assistance of counsel requires evidence outside the record on direct appeal, then the court cannot consider the claim); *see also State v.*

*Ishmail*, 54 Ohio St.2d 402, 406 (1978) (an appellate court is limited "to what transpired in the trial court as reflected by the record made of the proceedings"). We therefore do not agree with appellant's argument that trial counsel was ineffective for failing to ask the informants additional questions during cross-examination.

C

**{¶66}** Appellant next argues that trial counsel failed to provide the effective assistance of counsel during closing argument. He contends that counsel's closing argument "was not effective and likely had little impact on the jury." Appellant states that trial counsel's closing argument spans "less than three pages of the transcript" and complains that she did not "discuss reasonable doubt, the importance of it, or how high of a burden it is for the State to overcome."

**{¶67}** "[C]ounsel are afforded wide latitude during closing arguments. The length of a closing argument ordinarily involves questions of discretion and strategy." *State v. Grate*, 2020-Ohio-5584, ¶ 163; *accord State v. White*, 2024-Ohio-549, ¶ 65 (4th Dist.), quoting *Guysinger*, 2017-Ohio-1167, at ¶ 34 (4th Dist.) ("Generally, '[c]ounsel's decision on whether to give an opening statement or closing argument and how to formulate and deliver them are tactical decisions.'"). The length of a closing argument thus is a debatable trial tactic that generally

does "'not constitute a deprivation of effective counsel.'" *Grate* at ¶ 163, quoting *State v. Lang*, 2011-Ohio-4215, ¶ 192. Likewise, "'[t]he substance of closing argument falls within the realm of trial strategy.'" *State v. White*, 2024-Ohio-549, ¶ 65 (4th Dist.), quoting *State v. Cameron*, 2009-Ohio-6479, ¶ 31 (10th Dist.); *accord State v. Sharpless*, 1998 WL 1759070, *9 (11th Dist. Dec. 18, 1998) ("[t]he substance of closing argument is a trial strategy that may not be second-guessed with hindsight").

{¶68} In the case sub judice, we do not believe that appellant can overcome the presumption that the length and substance of trial counsel's closing argument was a matter of reasonable trial strategy, especially considering the strength of the State's evidence. Furthermore, given the overwhelming evidence of appellant's guilt, even if counsel's performance was deficient, appellant cannot show that any deficiency resulted in prejudice. *See id.* at ¶ 164 ("Given the overwhelming evidence of [the defendant]'s guilt, even if counsel's performance was deficient, [the defendant] cannot show that he was prejudiced."). Thus, even if counsel had raised the arguments that appellant desired, we do not believe that a reasonable probability exists that the jury would have reached a different decision. We therefore do not agree with appellant's argument that trial counsel was ineffective for failing to present a more

robust closing argument.

D

{¶69} In sum, appellant cannot establish that trial counsel was ineffective for (1) failing to further cross-examine the two informants or (2) choosing to present a succinct closing argument.

{¶70} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

{¶71} In his second assignment of error, appellant asserts that the trial court violated his right of self-representation by refusing to allow him to present his closing argument pro se.

{¶72} The right to counsel under the Sixth Amendment to the United States Constitution includes the right to self-representation. *See Faretta v. California*, 422 U.S. 806, 819-821 (1975) (examining the substance and structure of the Sixth Amendment to conclude that the right to self-representation is implied in the panoply of rights granted to criminal defendants); *see also Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942) (the Sixth Amendment right to the assistance of counsel implicitly includes a "correlative right to dispense with a lawyer's help").

{¶73} In accordance with this right, a criminal defendant "may proceed to defend himself without counsel when he

knowingly, voluntarily and intelligently elects to do so."
*State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph one of the
syllabus, citing *Faretta v. California*, 422 U.S. 806 (1975).
"If a trial court denies the right to self-representation when
the right has been properly invoked, the denial is per se
reversible error."  *State v. Neyland*, 2014-Ohio-1914, ¶ 71,
citing *State v. Reed*, 74 Ohio St.3d 534, 535 (1996), citing
*McKaskle v. Wiggins*, 465 U.S. 168, 177, fn. 8 (1984).

**{¶74}** To properly invoke the right, a defendant must
"'timely and unequivocally'" assert the right.  *State v.
Cassano*, 2002-Ohio-3751, ¶ 38, quoting *Jackson v. Ylst*, 921 F.2d
882, 888 (9th Cir.1990); *see also Martinez v. Court of Appeal of
California, Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000)
("most courts require" a defendant to assert the right to self-
representation "in a timely manner").  The failure to properly
invoke the right through a timely and unequivocal request
results in a waiver of the right.  *See Cassano* at ¶ 38, quoting
*Jackson* at 888 ("'The constitutional right of self-
representation is waived if it is not timely and unequivocally
asserted.'"); *accord State v. Knuff*, 2024-Ohio-902, ¶ 54.  Thus,
a trial court may properly deny a request for self-
representation that is untimely.  *See Knuff* at ¶ 57; *see also
State v. Degenero*, 2016-Ohio-8514, ¶ 14 (11th Dist.), quoting

*State v. Deir*, 2006-Ohio-6885, ¶ 34 (11th Dist.) ("a trial court may predicate 'its decision solely on the timing of appellant's request'").

**{¶75}** Courts typically consider a request for self-representation untimely when the defendant makes the request after the trial has begun.  *See Neyland*, 2014-Ohio-1914, at ¶ 77 (the trial court did not err by denying the defendant's request for self-representation as untimely when he did not make the request until right "before the beginning of the trial-phase closing arguments"); *State v. Vrabel*, 2003-Ohio-3193, ¶ 53 ("the trial court did not abuse its discretion and properly refused appellant's request to represent himself after voir dire had been completed and on the first day that evidence was to be presented"); *see, e.g., State v. Barron*, 2024-Ohio-5836, ¶ 31 (2d Dist.) ("request for self-representation was untimely since it was made on the second day of trial in the middle of the State's case-in-chief"); *State v. Beamon*, 2019-Ohio-443, ¶ 16 (12th Dist.) (request for self-representation made on the second day of trial, after the State had nearly completed its case-in-chief, was untimely); *State v. Montgomery*, 2008-Ohio-6077, ¶ 59 (5th Dist.) (request made after the presentation of three witnesses was untimely); *see also Knuff* at ¶ 58 (the trial court properly denied the defendant's request for self-representation as untimely when the defendant made the request eight days

before jury selection began).

**{¶76}** In the case at bar, after our review we do not believe that the trial court improperly denied appellant's request for self-representation.  Appellant did not assert the right until the close of evidence, immediately before closing arguments.  Thus, appellant did not timely assert the right, and the trial court properly denied it on that basis alone.  *See Neyland* at ¶ 77; *Degenero*, 2016-Ohio-8514, at ¶ 14 (11th Dist.).

**{¶77}** Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

III

**{¶78}** In his third assignment of error, appellant asserts that the record does not contain sufficient evidence to support his convictions and that his convictions are against the manifest weight of the evidence.

**{¶79}** Initially, we observe that "sufficiency" and "manifest weight" present two distinct legal concepts.  *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 23 ("sufficiency of the evidence is quantitatively and qualitatively different from the weight of the evidence"); *State v. Thompkins*, 78 Ohio St.3d 380 (1997), syllabus; *accord State v. Nicholson*, 2024-Ohio-604, ¶ 71.  A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient

to support the verdict as a matter of law. *Thompkins*, 78 Ohio St.3d at 386. When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Id.* at syllabus. The "critical inquiry" on appeal "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979); *e.g., State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997). Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

{¶80} Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *E.g., State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477 (1993). A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could

not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

**{¶81}** "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins*, 78 Ohio St.3d at 387. "The question to be answered when a manifest-weight issue is raised is whether 'there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 81, quoting *State v. Getsy*, 84 Ohio St.3d 180, 193-194 (1998), citing *State v. Eley*, 56 Ohio St.2d 169 (1978), syllabus, *superseded by constitutional amendment on other grounds as stated in Smith*, 80 Ohio St.3d at 102, fn. 4. A court that is considering a manifest-weight challenge must "'review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses.'" *State v. Beasley*, 2018-Ohio-493, ¶ 208, quoting *State v. McKelton*, 2016-Ohio-5735, ¶ 328. The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67 (2001); *State v. Murphy*, 2008-Ohio-1744, ¶ 31 (4th Dist.). "'Because the trier of fact sees and hears the

witnesses and is particularly competent to decide "whether, and

to what extent, to credit the testimony of particular

witnesses," we must afford substantial deference to its

determinations of credibility.'" *Barberton v. Jenney*, 2010-

Ohio-2420, ¶ 20, quoting *State v. Konya*, 2006-Ohio-6312, ¶ 6 (2d

Dist.), quoting *State v. Lawson*, 1997 WL 476684 (2d Dist. Aug.

22, 1997).  As the *Eastley* court explained:

> "'[I]n determining whether the judgment below is
> manifestly against the weight of the evidence, every
> reasonable intendment must be made in favor of the
> judgment and the finding of facts. . . .
>      If the evidence is susceptible of more than one
> construction, the reviewing court is bound to give it
> that interpretation which is consistent with the verdict
> and judgment, most favorable to sustaining the verdict
> and judgment.'"

*Id.* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10

Ohio St.3d 77, 80 (1984), fn.3, quoting 5 Ohio Jur.3d, Appellate

Review, § 60, at 191-192 (1978).  Thus, an appellate court will

leave the issues of weight and credibility of the evidence to

the fact finder, as long as a rational basis exists in the

record for its decision.  *State v. Picklesimer*, 2012-Ohio-1282,

¶ 24 (4th Dist.); *accord State v. Howard*, 2007-Ohio-6331, ¶ 6

(4th Dist.) ("We will not intercede as long as the trier of fact

has some factual and rational basis for its determination of

credibility and weight.").

{¶82} Accordingly, if the prosecution presented substantial,

credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *E.g., Eastley* at ¶ 12, quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *Black's Law Dictionary* 1594 (6th ed.1990) (a judgment is not against the manifest weight of the evidence when "'"the greater amount of credible evidence"'" supports it). A court may reverse a judgment of conviction only if it appears that the fact finder, when it resolved the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983); *accord McKelton* at ¶ 328. A reviewing court should find a conviction against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Clinton*, 2017-Ohio-9423, ¶ 166; *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

{¶83} In the case at bar, after our review we do not believe that the record lacks sufficient evidence to support appellant's convictions, or that his convictions are against the manifest

weight of the evidence.[4]  The State introduced into evidence audio and video recordings that obviously implicated appellant. The audio recording reveals that appellant understood Mrs. Elliott's statement that she needed "two" to mean something illicit.  Otherwise, he would not have mentioned that, if any customers were present, Mrs. Elliott should either (1) not enter the store, or (2) act like she was shopping if she did enter the store.  Additionally, appellant asked Mrs. Elliott if she needed "two" "in the same bag."  This question further demonstrates that he understood what Mrs. Elliott meant by "two."  Also, during the phone call, appellant informed Mrs. Elliott that he would not "be able to do this until they were gone."  The context of the entire conversation suggests that "this" meant the drug deal and "they" meant customers.

{¶84} The video recording adds more evidence of appellant's guilt.  The video showed that, after Mrs. Elliott approached the counter, appellant entered a back room, returned with a small plastic bag, handed the bag to Mrs. Elliott, and accepted money in exchange for the plastic bag.  The substance inside the

---

[4] We observe that appellant's argument does not (1) specifically identify any essential elements of the offenses as lacking sufficient evidence or (2) challenge any particular findings concerning those elements as being against the manifest weight of the evidence.  Rather, appellant generally asserts that (1) the record lacks sufficient evidence to support his convictions and (2) his convictions are against the manifest weight of the evidence.  We limit our review accordingly.

plastic bag later tested positive for fentanyl.  From all of this evidence, any rational trier of fact certainly could have found, beyond a reasonable doubt, that the State had established the essential elements of the offenses.

{¶85} Moreover, nothing in the record suggests that the jury committed a manifest miscarriage of justice by convicting appellant.  Assuming, arguendo, that the jury had some doubts about the informants' credibility, the audio and video recordings helped surmount any credibility concerns regarding their testimonies about the controlled purchase.

{¶86} Furthermore, nothing in the record suggests that the audio and video recordings lacked authenticity or persuasive value.  Indeed, two detectives with the drug task force authenticated the audio and video recordings and identified appellant as the individual who sold drugs to Mrs. Elliott.  *See State v. Smith*, 2020-Ohio-5316, ¶ 45 (4th Dist.) (conviction was not against the manifest weight of the evidence when the officer's testimony about the controlled buy, the existence of audio/video recordings, and the recovery of heroin and methamphetamine after the controlled buys corroborated the informant's testimony); *State v. McCullough*, 2014-Ohio-1556, ¶ 5 (6th Dist.) ("The record reflects that this case involved uniquely compelling and irrefutable evidence of appellant's guilt.  At trial, the informant's clear and thorough testimony

reflecting appellant's guilt was corroborated and bolstered by the testimony of the investigating officers, the audio recordings of the transactions, the identification of appellant's voice from the recordings, the serial numbered currency used in the controlled buys, and the expert testimony verifying the identity of the substances sold.").

{¶87} Appellant nevertheless asserts that to convict him, "the factfinder had to rely almost completely on" the informants' testimonies.  Appellant does not, however, acknowledge that the audio and video recordings implicate him.  Thus, contrary to his assertion, the jury did not need to rely "almost completely on" the informants' testimonies to convict him.  We therefore do not believe that appellant's convictions are against the manifest weight of the evidence.

{¶88} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error and affirm the trial court's judgment.

                                                    JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover from appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.

Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.